# IN THE SUPREME COURT OF IOWA

No. 12–0133

Filed June 22, 2012

**IN THE INTEREST OF A.B. & S.B.,**
    Minor Children,

**S.B.,** Father,
    Appellant.

_____

Appeal from the Iowa District Court for Polk County, Constance Cohen, Judge.

The State seeks further review of a court of appeals decision reversing the termination of a father's parental rights. **COURT OF APPEALS DECISION VACATED; JUVENILE COURT JUDGMENT AFFIRMED.**

Kate Strickler of KE Law, L.L.C., Des Moines, for appellant father.

Donna R. Beary, Des Moines, for mother.

Thomas J. Miller, Attorney General, Bruce L. Kempkes, Assistant Attorney General, John P. Sarcone, County Attorney, and Stephanie E. Brown, Assistant County Attorney, for appellee.

John P. Jellineck, Des Moines, guardian ad litem for minor children.

**MANSFIELD, Justice**.

In this case, a juvenile court terminated a father's parental rights to two children pursuant to Iowa Code section 232.116(1)(*d*), (*g*), (*h*), and (*l*) (2011). The father appealed, arguing that the juvenile court violated his due process rights when it ordered him to provide a fingernail drug test after the termination trial, that the State failed to prove the grounds for termination, and that termination of the father's parental rights was not in the children's best interests. The court of appeals reversed, principally on the basis there was no evidence in the record as to the reliability or the accuracy of the fingernail drug test, nor information as to how the test results were to be interpreted. We find that error was not preserved on the father's due process claim and agree with the juvenile court that the evidence including the fingernail test was sufficient to warrant termination and termination was in the children's best interests. Accordingly, we vacate the decision of the court of appeals and affirm the judgment and order of the juvenile court.

## I. Facts and Procedural History.

Silverio is the father, and Nelda is the mother, of S.B. (born 2004) and A.B. (born 2007). Silverio and Nelda were never married, and both have children from prior relationships. They are no longer together, and their turbulent on-again, off-again relationship has been plagued by drugs and domestic violence. Silverio, the subject of six founded reports of child abuse, has criminal convictions for assault and possession of controlled substances.

Silverio's rights to another child were previously terminated. Silverio explained that the prior termination occurred because he had agreed with the child's mother, Shannon, not to attend the termination hearing. According to Silverio, he and Shannon jointly decided it would

be best to allow the termination to occur in order to protect Shannon's parental rights and "get them [the Department of Human Services] out of our lives."

S.B., A.B., and their younger half brother, D.G., were all living with their mother Nelda when these children came to the attention of DHS in November 2010. At that time, it was reported that Nelda had not followed through with medical care and doctor's recommendations for D.G.'s special medical needs. Additional concerns arose regarding Nelda's lack of stable housing, Nelda's illegal drug use, and truancy-related issues with respect to S.B. At this time, DHS began offering Nelda services.

In January 2011, Silverio was arrested when marijuana, pills (including morphine), and a switchblade were found in his coat pockets. At the termination trial in this case, he claimed the drugs were not his:

> Q. Why did you have them? A. I don't know why they was in my pocket.
>
> Q. Were they yours? A. No.
>
> Q. Whose were they? A. One of my friends.
>
> Q. Why did you have them? A. I don't know. It must have been put in my pocket.

In early March 2011, all three children—S.B., A.B., and D.G.—began living with Silverio in the basement of Silverio's brother's home. Nelda was essentially homeless and had felony arrest warrants for identity theft. On March 16, while charges from the January incident were still pending, Silverio was arrested for possession of cocaine and methamphetamine. The police saw Silverio carrying a black duffel bag and running away from the direction of police cars. When the police

apprehended him, on the ground near the bag they retrieved a digital scale, cocaine, and methamphetamine. Silverio denied these were his.[1]

That same day, the juvenile court signed an order of temporary removal, placing the children in foster care. Silverio was subsequently released from jail, conditioned upon obtaining a substance abuse evaluation and complying therewith.

On March 17, Nelda was arrested for identity theft and incarcerated. Also that day, the State filed petitions alleging the children to be in need of assistance (CINA) pursuant to Iowa Code sections 232.2(6)(*c*)(2) and (*n*) (2011). The parents and children were ordered to submit to hair stat testing. Nelda and all three children tested positive for methamphetamine in March. Silverio claimed to have undergone a hair test, but the collecting agency had no records of it. Later, he shaved his head and was unable to provide a hair sample for testing.

The juvenile court confirmed and continued the removal of the children after an uncontested hearing held on March 22. The court ordered numerous services to be provided to the family, including sibling contact, bus tokens for Nelda, dental care for the children, drug testing, Family Safety Risk and Permanency Services, substance abuse evaluations, and a mental health evaluation for Nelda.

Nelda was still incarcerated on April 20 when the CINA adjudication hearing was held. At the hearing, the juvenile court determined that "placement outside the parental home [wa]s necessary because continued placement in or a return to the home would be contrary to the children's welfare because of improper supervision and

---

[1]Another individual was also arrested in the vicinity, but the only bag that was found belonged to Silverio.

exposure to illegal drugs." The children were adjudicated in need of assistance and remained in foster care.

Silverio submitted to a urinalysis in early April which tested positive for methamphetamine. He maintains this was a false positive and claims he has never used methamphetamine and has not used marijuana since before S.B. was born.

Subsequently, Silverio pled guilty to the drug possession and weapon charges stemming from the January incident and received a thirty-day sentence. He also agreed to a plea bargain in which the charges arising out of the April incident were reduced to one count of possession of drug paraphernalia, to which he pled guilty and was fined.

On May 22, days after he was released from jail, Silverio was arrested again for domestic abuse assault, following an incident with Shannon. A no-contact order was issued. On August 18, Silverio pled guilty under a plea agreement in which the charge was amended to disorderly conduct. That same day, the no-contact order was canceled at Shannon's request.

Following his release from jail in May, Silverio provided numerous urine samples that all tested negative for illegal drugs, completed anger management class,[2] and appeared to be making progress with various parenting and reunification services. He took parenting classes and did not miss any family team meetings or court hearings. He completed a recommended drug and alcohol awareness program and underwent a mental health evaluation. Meanwhile, Nelda—the mother of A.B., S.B., and D.G.—remained incarcerated much of the time.

---

[2]Silverio had previously completed the batterer's education program (BEP) in 2010.

Silverio also obtained full-time employment. He received a glowing character reference from his employer which he submitted as an exhibit in the termination hearing. As of July, Silverio had resumed regular supervised visitation with the children characterized by appropriate interaction. During the visits, he brought the children snacks and gifts and provided their foster parents with clothing, coats, school supplies, and diapers for the children. Silverio attended three of A.B.'s therapy sessions and communicated with S.B.'s school and with the children's daycare provider. Substance abuse evaluators also reported favorably on Silverio.

Despite Silverio's progress and participation in reunification efforts, DHS had serious concerns regarding his "lack of honesty and insight." The concerns related to Silverio's relationships with Nelda and Shannon, his potential inability to control his anger, and his involvement with illegal substances. Silverio's head still was shaven and he did not have enough hair for a hair stat test to be performed. Also, A.B. continued to recall memories of physical violence between Silverio and Nelda and between Silverio and Shannon.

Silverio was approved for semi-supervised visitation, and the first visit occurred around August 20. However, Silverio brought Shannon to the visit and thereafter the semi-supervised visitation was canceled and supervised visitation resumed.

A permanency hearing was held on September 1. Silverio requested additional time to obtain custody. The children's guardian ad litem (GAL) recommended Silverio be given additional time to obtain custody. The State recommended termination of Silverio's parental rights. At the conclusion of the hearing, the juvenile court instructed the State to institute proceedings to terminate Silverio's parental rights

within thirty days. The court set October 25 as the date for the permanency/termination of parental rights hearing.

The State filed a petition to terminate Silverio's parental rights on September 23. On October 11, 2011, Court Appointed Special Advocates (CASA) prepared a report. The report indicated that the children were thriving and happy in foster care but did describe a bond between Silverio and both A.B. and S.B. The report expressed a number of concerns about Silverio, including his "ability to speak with truth," his "ability to effectively establish what he has learned in parenting classes," his "involvement with Shannon," and his "ability to identify positive and healthy relationships." The report also related a very recent incident in which one of the foster parents had felt intimidated by Silverio.[3] In addition, the report expressed concerns about both Nelda and D.G.'s father. The report recommended termination of all parental rights to all three children.

On October 8, after the petition for termination of parental rights was filed, Silverio rented an apartment large enough for both children.

The permanency/termination of parental rights hearing began on October 25. Silverio appeared in person and testified. Nelda testified by telephone from jail. D.G.'s father had been deported out of the country and did not attend. Other witnesses included Shannon, one of the foster parents, the therapist for A.B., and a DHS caseworker. The caseworker questioned Silverio's honesty with respect to drug testing, noting she had seen him with his head both shaved and unshaved. The therapist

---

[3]According to the foster parent, the incident arose after the parent told the DHS caseworker about inappropriate statements Silverio made over the phone to A.B. Silverio allegedly told A.B. that A.B., S.B., Silverio, and Nelda would all live together in the future.

reported that A.B. had drawn pictures of and spoken about her father and mother's apparent drug use.

At the conclusion of evidence on November 2, the juvenile court asked the parties if they had any other requests. Silverio's attorney requested that Silverio be granted additional visits with the children. The DHS caseworker responded that she would like to discuss the matter with the children's therapist and also find out if there was a family member who could supervise the additional visits.

The following exchange occurred:

> THE COURT: [T]he court would expect that [Silverio's] visits can be transitioned into semi-supervised if the child's therapist agrees and [Silverio] can get himself there alone or with an approved person . . . .
>
> . . . .
>
> [THE STATE]: Your Honor, I—We've requested, and it's been ordered in the past, for a hair test.
>
> And [Silverio] hasn't been able to provide one since his hair is not long enough.
>
> [The DHS case worker] informs me they can do a nail test, so I would just ask that be substituted instead.
>
> THE COURT: Okay.
>
> [SILVERIO'S COUNSEL]: And if I could respond, Your Honor?
>
> [Silverio] calls every day for his number, for his urine tests; and he has not missed any of his urine tests. He goes every time that his number is called, and all of his tests have come back clean. I believe there was one that came back not clean . . . .
>
> THE COURT: Okay. Well, this is a service that's being offered. I think it's a reasonable effort.
>
> If you choose to take advantage of it, you know, it's an opportunity for you to demonstrate that you have absolutely nothing to hide. We all know that urine screens can be adulterated. So I urge you to comply with that request. If you're doing your homework, turn it in.

SILVERIO . . . : Okay.

THE COURT: Okay. Then we'll be in recess until November 28 . . . .

At the continued hearing on November 28, Silverio's counsel reported:

At the end of the [last hearing] . . . we all agreed that [Silverio] could have semisupervised visits if he passed a fingernail test. He went to have a fingernail test done, but . . . the site . . . said they no longer do fingernail testing.

The DHS caseworker responded:

This nail test was requested [a] long time ago. [Silverio], looks like, went to provide that test on Wednesday last week, and they told him to come back today. He did. And today he was told that they are not doing nail test. This nail test[] was approved by my director. I called back the number, and they said that they will call me and let me know if he can provide this nail test. So I am still hoping that he will be able to do so sometime this week.

I am very concerned that he didn't go to provide that test as soon as this test was requested.

Silverio's counsel responded that Silverio was "perfectly willing to do the fingernail test . . . [a]nd he would be happy to start dropping UAs again . . . ." The court considered the matter submitted, but stated it was

leaving the record open for two more weeks . . . for [Silverio] to submit a fingernail test and for [the court] to get the results on that . . . then another week beyond that to allow parties time to submit any written memoranda or proposed findings of fact [or] conclusions of law.

On November 29, 2011, Silverio submitted to the fingernail test. According to the report from the testing laboratory dated December 7, 2011, the sample tested positive for methamphetamine.[4]

---

[4]The test reading was 4,363 picograms per milligram, nearly nine times the stated threshold of 500 pg/mg for a positive reading.

On December 14, 2002, the GAL filed a written statement supporting termination of parental rights. He noted Silverio "has done some things well" and "[i]t is apparent he loves both of his children." Yet the GAL added, "[Silverio's] repeated delays in obtaining a hair stat test are extremely troubling; his subsequent positive result on the November 29th fingernail test only serves to confirm those concerns." The GAL also commented, "I do not see how it is feasible to return the children to [Silverio's] care." In conclusion, the GAL expressed the view that it was in A.B.'s and S.B.'s best interests for both parents' rights to be terminated and for them to receive "permanency, along with a safe, stable and nurturing home."

On January 10, 2012, the juvenile court entered an order terminating the mother's and the father's parental rights to all three children. Specifically, the court terminated Silverio's parental rights to A.B. and S.B. pursuant to Iowa Code section 232.116(1)(*d*), (*g*), (*h*), and (*l*). Among other things, the court noted the following:

> Reports of [Silverio] minimizing his substance abuse problems were substantiated by his repeated delays in obtaining a hair stat test after being ordered to do so, and his fingernail test result on November 29, 2011. His fingernail screen tested positive for methamphetamine . . . . [S]adly, there is no question that he is still struggling with abstaining from the use of methamphetamine and has not been forthcoming about his addiction to the extent that would allow services to be tailored to meet his needs.
>
> . . . .
>
> [Silverio's] drug screen [i]n April . . . was positive for methamphetamine. Yet, he reported that he had no problems with illegal substances. [Silverio] underwent a substance abuse evaluation on February 16, 2011, before the petitions were filed, in order to comply with the requirements of the criminal cases pending against him . . . . In that evaluation, Silverio reported his last use of marijuana as being eight years ago and denied any use of methamphetamines, cocaine, opiates, heroin, or any other

drugs. Accordingly, there were no recommendations for further treatment.

On August 15, 2011, [Silverio] underwent another substance abuse evaluation. Again, this evaluation was required because of pending drug charges. And again, in spite of a drug test that was positive for methamphetamine in April, and ongoing drug-related charges, [Silverio] continued to deny drug use. Based upon his representations to the evaluator, no recommendations for further treatment were made.

Obviously, the results of the evaluations were based upon the sole representations of [Silverio], which representations were false. He neglected to tell the evaluator that he was testing positive for methamphetamine in April, 2011, and, more disturbing, provided a drug screen positive for methamphetamine in December, 2011, as per the fingernail analysis. Clearly, Silverio . . . suffers from a severe and chronic substance abuse problem that places himself and others in danger as evidenced by prior acts. His fervent denial of drug use in the face of clear evidence to the contrary indicates that he is not ready to begin the changes necessary to provide a safe and stable drug-free environment for young children. Given his denial, his prognosis is poor. There is no reason to believe that he will be able to resolve his unadmitted addiction in a reasonable amount of time given these young children's need for a permanent home.

Because of his unresolved addiction, contact between [Silverio] and the children has been supervised by professionals to date. Efforts to relax the level of supervision were disrupted when he participated in unauthorized contact with the children while at his brother's home. His testimony that he had been clean since before S[.B.] was born was completely undermined by the drug screen results in April and December.

In addition to his denial of ongoing drug abuse, there are numerous drug related charges he has faced or is currently facing. For example, in January, 2011, when charged with carrying concealed weapons and possession of marijuana, he claimed that the report that the knife was in his pocket was incorrect and that a friend must have put the drugs in his pocket. In March, 2011, he was carrying a small black duffel bag and running from the direction of police cars. Police later found a small black scale and drugs near the bag that he had been carrying. The charges that resulted in the children being removed, the possession of methamphetamine and cocaine, are simply too consistent with his past pattern to be considered coincidental and not related to his own drug use.

Were it not for the denial of drug use in the face of credible evidence to the contrary, reunification would be achievable. Silverio has complied with anger management therapy, gained insight into his domestically violent relationships, and has demonstrated appropriate parenting skills. The children are happy to see him at visits and he provides appropriate snacks and activities for them. He is employed and has appropriate housing. He has benefited from parenting classes.

It is clear that [Silverio] loves the children and that they love him. But it is also clear that he is not in a position to provide the safe and stable home for them that they need and deserve. Additionally . . . as recently as October 11, 2011, he became very argumentative with A[.B.]'s foster parent and she had to end the conversation. She felt that he was trying to intimidate and bully her.

[Silverio] has harmed A[.B.] by giving her false hope that she and her parents would all be together again someday. This action on his part demonstrates a lack of insight into the toxicity of his relationship with Nelda.

S[.B.] and A[.B.] have related feelings of relief in their current foster homes. S[.B.] has repeatedly told his foster parents that he likes living there because he no longer has to worry about his mom and dad fighting or his dad and Shannon fighting. While [Silverio] made efforts to call A[.B.], he did not make a similar effort to maintain telephone contact with S[.B.]

. . . .

[Silverio] is this case's greatest disappointment. Because he is unwilling to admit that he has a substance abuse problem, he cannot begin to resolve it. Because he believes that he has completed anger management classes, he believes he has resolved his anger issues; however, recent conversations with S[.B.] and A[.B.]'s foster parents belie that conclusion. Although there is a bond with the children, because of his deceit and inability to admit that he needs more help, visits are still professionally supervised and cannot progress beyond that restriction without risk of harm to the children.

Silverio appealed the termination order.[5] He urged that the juvenile court violated his due process rights when it ordered a drug test

---

[5]Neither Nelda nor D.G.'s father have appealed the termination of their parental rights.

at the end of the termination trial and relied on those results, that the State had failed to establish a statutory ground for termination by clear and convincing evidence, and that termination of Silverio's parental rights was not in the best interests of A.B. and S.B.

A divided panel of the court of appeals reversed. The majority reasoned that Silverio had failed to preserve error on his objections to the fingernail test but stated that it was "bothered by the results of the fingernail test" because it found "no evidence in the record as to the reliability or the accuracy of this type of test." The court added that the record did not provide "any information as to how such test results are to be interpreted" and that there was "no way of knowing" whether the test indicates drug usage in the recent or distant past. "For all we know, the positive test merely confirms the April test results."

Because it was unable to assign any weight to the fingernail test, the court of appeals found the evidence insufficient to warrant termination and also found that termination was not in the children's best interests. The court took note of the very positive reports on Silverio from his employer and from various service providers. The court concluded, "We believe a single fingernail test, without any information about its accuracy, reliability, or how its results are to be interpreted, cannot support termination of the father's parental rights under this record." Thus, the court of appeals reversed and remanded with instruction to grant Silverio six additional months toward reunification.

One judge on the panel dissented. She acknowledged that "the majority sets forth an excellent and compelling opinion," but reasoned that "the issues as they relate to the fingernail drug test were simply not preserved for our review." In her view, the majority "inappropriately resurrect[ed] the fingernail test issue, critique[d] the test, suggest[ed] it

was unreliable, and then conclude[d] that termination was improper." She specifically noted that the juvenile court had kept the record open, thereby providing an opportunity for Silverio to challenge the test results—and he had failed to do so.

We granted the State's application for further review.

**II.  Standard of Review.**

"We review proceedings to terminate parental rights de novo." *In re Interest of H.S.*, 805 N.W.2d 737, 745 (Iowa 2011). "We give weight to the juvenile court's factual findings, especially when considering the credibility of witnesses, but we are not bound by them." *Id.*

**III.  Analysis.**

**A.  The Fingernail Drug Test.**  Two succinct and clearly-written opinions from experienced judges on the court of appeals have framed the issues well for us. The court of appeals majority agreed with the State that the father had failed to preserve error on his objections to the fingernail test results. Yet it overturned the juvenile court's termination order because it found those test results uninformative and unreliable. The dissent, on the other hand, accused the majority of honoring error preservation principles in name only. It maintained the majority was taking on the role of advocate by raising concerns about the fingernail test that the father had not asserted below.

Upon our review, we land in a middle ground between these two opinions. We find that the court of appeals majority's criticisms of the fingernail test, at least to some extent, did not violate principles of error preservation. But we disagree with the majority's conclusion that the record, including the fingernail test, lacks clear and convincing evidence to warrant termination of Silverio's parental rights.

We begin with a few points. First, the general rule that appellate arguments must first be raised in the trial court applies to CINA and termination of parental rights cases. *In re Interest of K.C.*, 660 N.W.2d 29, 38 (Iowa 2003) ("Even issues implicating constitutional rights must be presented to and ruled upon by the district court in order to preserve error for appeal."); *In re Interest of A.M.H.*, 516 N.W.2d 867, 872 (Iowa 1994) (holding that by failing to file a motion under rule 179(b), now rule 1.904(2), a mother waived her statutory and due process challenges to the deficiencies of the juvenile court's order); *In re Interest of S.J.M.*, 539 N.W.2d 496, 499 (Iowa Ct. App. 1995) (holding that a father waived any error in the admission of testimony by not objecting to it). Thus, Silverio cannot complain about the admission of the test report.

The juvenile court did not order Silverio to submit to a fingernail drug test; instead, he voluntarily agreed. Several weeks after the close of testimony, Silverio still had not undergone the test. Nonetheless, he reiterated, through counsel, that he was "perfectly willing" to do it. He then voluntarily appeared at the laboratory the next day. Even after the test report was filed, the court made clear that it was providing "another week beyond that to allow parties time to submit any written memoranda." But Silverio failed to file anything with the juvenile court regarding the test.

Of course, Silverio's failure to object to the test results does not prevent the fact finder from deciding what weight to give to the evidence, after it has been admitted. *See DeLong v. Brown*, 113 Iowa 370, 373, 85 N.W. 624, 625 (1901) ("[T]he weight to be given to evidence and its admissibility are different matters."). Thus, it was fair for the court of appeals to comment on the limitations of the test report and observe that "we have no way of knowing, based upon this record, whether the

fingernail test indicates current drug usage, usage in the last week, last month, or from several months ago."

On the other hand, the majority may have gone too far when it decried an absence of evidence "as to the reliability or the accuracy of this type of test." The two-page test report was admitted. It has no indicia of *unreliability* on its face. It identifies who collected the sample, where, and when; it provides a chain of custody for the sample; and it identifies who ran the tests, where, and when. The various drug screenings that the laboratory performed are indicated along with the results. The test report clearly states that the methamphetamine reading was nine times the threshold for a positive test.

Under our rules of evidence, exhibits generally are not admitted unless there is "evidence sufficient to support a finding that the matter in question is what its proponent claims." Iowa R. Evid. 5.901(*a*). It follows that when an exhibit has been admitted without objection, the fact finder may conclude that it is what it purports to be. Of course, other evidence—or aspects of the exhibit itself—may call this conclusion into question. But when the exhibit has been received without objection, it does not raise any concerns on its face, and there is a lack of other evidence suggesting it is not reliable, the proponent of the exhibit should not be faulted for failing to offer separate evidence to establish its reliability.

The principle is one we have recognized before:

[T]he proper rule to be adhered to in this state is that when hearsay evidence which would be objectionable and incompetent when properly objected to is admitted without objection and is relevant and material to an issue it is to be considered and given its natural probative effect as if it were in law competent evidence. Its weight is to be determined by the trier of fact by the same criteria as is employed in considering other competent evidence.

*Tamm, Inc. v. Pildis*, 249 N.W.2d 823, 834 (Iowa 1976); *see also State v. DeWitt*, 811 N.W.2d 460, 477 (Iowa 2012) (quoting this language).

In sum, the court of appeals majority was correct in their assessment that the positive fingernail test did not indicate *when* Silverio had last used methamphetamine. The test report did not disclose this, and the State did not offer evidence to interpret the report. At the same time, however, it was not the State's burden to offer evidence to establish the reliability of a report that appeared valid on its face and to which no objection was raised. If nothing else, the November 2011 positive fingernail test confirms the April 2011 positive urine test and explains Silverio's earlier apparent evasiveness regarding both hair and fingernail testing.

**B. Grounds for Termination.** We now turn to the question whether clear and convincing evidence (including the fingernail test) established a ground for termination. When the juvenile court terminates parental rights on more than one statutory ground, we may affirm the juvenile court's order on any ground we find supported by the record. *In re Interest of D.W.*, 791 N.W.2d 703, 707 (Iowa 2010). We find termination was proper under section 232.116(1)(*d*).

Under section 232.116(1)(*d*) termination may be ordered if the court finds that both of the following have occurred:

> (1) The court has previously adjudicated the child to be a child in need of assistance after finding the child to have been physically or sexually abused or neglected as the result of the acts or omissions of one or both parents, or the court has previously adjudicated a child who is a member of the same family to be a child in need of assistance after such a finding.
>
> (2) Subsequent to the child in need of assistance adjudication, the parents were offered or received services to correct the circumstance which led to the adjudication, and

the circumstance continues to exist despite the offer or receipt of services.

There is no dispute that A.B. and S.B. were adjudicated as CINA based on findings they had been neglected by both parents. In its uncontested CINA adjudication order of April 20, 2011, the juvenile court concluded that "placement outside the parental home [wa]s necessary because continued placement in or a return to the home would be contrary to the children's welfare because of improper supervision and exposure to illegal drugs." The fighting issue here is whether this circumstance that led to the CINA adjudication continued to exist despite the offer of services to Silverio.

The juvenile judge, who had followed this case from the beginning and heard the live testimony, concluded that the circumstance remained. We believe her finding is supported by clear and convincing evidence. As noted by the juvenile court, Silverio had failed to address his illegal drug use and was in denial.

Silverio continuously asserted, both before and during the termination hearing, that he had never used any drugs other than marijuana, and the marijuana use had ended before S.B. was born. But hair tests on A.B. and S.B. both came back positive for methamphetamine when they were removed from Silverio's care in March 2011. Silverio claimed to have provided a hair sample at the same time, but the collecting agency had no record of it. Later Silverio shaved his head and therefore did not have enough hair for a sample. Silverio did have a urine test that detected methamphetamines in April, which he claimed was a false positive. Also, A.B. recalled prior illegal drug use by her father in her discussions with her therapist.

Silverio denied having any substance abuse issues in both his February and August 2011 substance abuse evaluations. The evidence supports the juvenile court's finding that he was not forthcoming in these evaluations. In his August evaluation, he declined to disclose the positive result in his April drug test.

In January 2011, and again in March 2011, Silverio was arrested on drug-related charges, and both times he entered guilty pleas. The juvenile court was entitled to find Silverio's explanations for these incidents self-serving and implausible. Silverio claimed he was the victim of a friend's decision to slip drugs into his jacket pockets in January, although Silverio later pled guilty to possession of marijuana and possession of prescription medication without a prescription. The police report stated that when officers apprehended Silverio, he took off the jacket so as not to be associated with it, knowing that it contained illegal controlled substances. It also indicates that Silverio "admitted to officers voluntarily that the pills were his."

In March, Silverio was apprehended with a black duffel bag while running away from the police. A digital scale, cocaine, and methamphetamines were found on the ground in close proximity to him. He ended up pleading to possession of drug paraphernalia. Yet at the termination hearing, Silverio maintained he was not the owner of those drugs, and there was no factual basis for the possession charge to which he had pled guilty.

Along these lines, we find the November 2011 positive fingernail test to be significant, regardless of the time period for which it demonstrates that Silverio used methamphetamines. It is further evidence that the April 2011 urinalysis did not produce a false positive, that Silverio had been deceiving himself and others, and that he had

failed to confront his history of illegal drug use. Also troubling was Silverio's delay in making himself available for the test, after he had agreed to undergo the test.

Silverio's participation in parenting services was commendable. To his credit, he also did several other things. He remedied DHS's concerns about the inadequacy of his housing situation (although not until the petition for termination of parental rights was pending), completed anger management classes, and obtained full-time employment. However, we believe the State demonstrated that Silverio's unaddressed substance abuse problem continued to exist at the time of the termination hearing despite the receipt of services.

We have long recognized that an unresolved, severe, and chronic drug addiction can render a parent unfit to raise children. *See, e.g.*, *In re Interest of J.K.*, 495 N.W.2d 108, 112–13 (Iowa 1993) (terminating parental rights where mother demonstrated unresolved drug dependency and declining to take her "word that she stayed away from drugs"). "No parent should leave his small children in the care of a meth addict—the hazards are too great." *State v. Petithory*, 702 N.W.2d 854, 859 (Iowa 2005).[6]

The juvenile court concluded that if not for Silverio's "denial of drug use in the face of credible evidence to the contrary, reunification

---

[6]We believe the record also supports the juvenile court's concerns about the ongoing potential for domestic violence in the household if A.B. and S.B. were reunified with Silverio. Despite having completed BEP in 2010, Silverio was arrested in May 2011 for an incident of domestic abuse toward Shannon. According to the police report, Shannon told police that Silverio grabbed her arms causing red marks and spit in her face. (Silverio denied this conduct at the termination hearing, claiming that was "just the word of the neighbor who didn't show up to testify"—not Shannon.) When the first semi-supervised visit was scheduled, Shannon came with Silverio, having agreed to drop the no-contact order two days before.

would be achievable." However, because of those denials, Silverio's drug problem was unresolved, and thus, he was "not in a position to provide the safe and stable home [A.B. and S.B.] need and deserve." The evidence demonstrates that Silverio's substance abuse issue continued to place himself and others in danger despite his otherwise laudable participation in services. We agree with the juvenile court's determination that, despite Silverio's receipt of services to correct the circumstances that led to the CINA adjudication, those circumstances continued to exist at the time of the termination hearing. *See* Iowa Code § 232.116(1)(*d*).

**C. Best Interests of the Children.** Even after we have determined that statutory grounds for termination exist, we must still determine whether termination is in the children's best interests. Iowa Code § 232.116(2); *see also In re Interest of P.L.*, 778 N.W.2d 33, 39 (Iowa 2010). In evaluating this issue, we " 'give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child.' " *P.L.*, 778 N.W.2d at 39 (quoting Iowa Code § 232.116(2)); *see also In re Interest of J.E.*, 723 N.W.2d 793, 802 (Iowa 2006) (Cady, J., concurring specially) (stating that a child's safety and the child's need for a permanent home are the "defining elements" in determining a child's best interests).

Both A.B. and S.B. were doing well in their respective foster placements at the time of the hearing. In August 2011, S.B. told the CASA volunteer that he liked Silverio because he bought him toys, but he wanted to stay with his foster mother and father. The foster mother testified that S.B. was "starting to build confidence." In September, S.B. repeatedly told his foster parents that he liked living with them because

he no longer had to "worry" and he didn't have to "hear all of the fighting." As of September 30, S.B. had not missed or been tardy for a single day of school since his placement began in March. He was doing well academically, making friends, and enjoying school so much that he "never want[ed] to miss [it]." This was noteworthy because truancy concerns in regards to S.B. were one of the reasons the children first came to the attention of DHS in November 2010. Furthermore, S.B.'s foster parents had indicated that they planned to adopt him and his half brother D.G., thereby providing the permanent, safe, stable home environment they deserve.

Likewise, A.B.'s therapist reported that A.B. was guarded around Silverio and that her primary sense of security and safety was around her foster family. According to the therapist, because of past trauma, A.B. was "a very uncertain child" and "fearful of being rejected." A.B. clearly dreaded a possible reoccurrence of the unwelcoming environment to which she had been exposed before.

By the time the termination hearing ended, A.B. and S.B. had been out of the custody of their natural parents for over eight consecutive months. While Silverio had clearly taken advantage of services offered by DHS, the fact remained that during 2011 he had been involved in two drug-related incidents and one incident of domestic violence. He downplayed the latter incident and offered far-fetched denials of the former incidents. Most importantly, he refused to acknowledge any illegal drug use despite strong evidence to the contrary and despite the additional concern raised by A.B. and S.B. having tested positive for methamphetamine when they were removed from Silverio's custody. We agree with the juvenile court that "termination of parental rights is in the

children's best interest and would be less detrimental than the harm that would be caused to them by continuing the parent/child relationship."[7]

"It is well-settled law that we cannot deprive a child of permanency after the State has proved a ground for termination under section 232.116(1) by hoping someday a parent will learn to be a parent and be able to provide a stable home for the child." *P.L.*, 778 N.W.2d at 41. A.B. and S.B. "simply cannot wait for responsible parenting. Parenting cannot be turned off and on like a spigot. It must be constant, responsible, and reliable." *In re Interest of L.L.*, 459 N.W.2d 489, 495 (Iowa 1990) (discussing the father's lack of motivation to change and his reversion to his old ways with respect to issues of domestic violence and alcohol and drug abuse). "It is simply not in the best interests of children to continue to keep them in temporary foster homes while the natural parents get their lives together." *In re Interest of C.K.*, 558 N.W.2d 170, 175 (Iowa 1997).

"Insight for the determination of the child's long-range best interests can be gleaned from 'evidence of the parent's past performance for that performance may be indicative of the quality of the future care that parent is capable of providing.'" *In re Interest of C.B.*, 611 N.W.2d 489, 495 (Iowa 2000) (quoting *In re Interest of Dameron*, 306 N.W.2d 743,

---

[7]In his petition on appeal, Silverio advances a cursory argument that termination is not in the best interests of the children because it will potentially deprive them of their Hispanic heritage. This issue was not raised below. Even if it had been preserved below, we would still have to give primary consideration to " 'the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child.' " *See P.L.*, 778 N.W.2d at 39 (quoting Iowa Code § 232.116(2)); *see also In re F.W.*, 870 A.2d 82, 86 (D.C. 2005) ("[R]ace is simply a factor that may be considered by the trial court in the process of determining the best interests of the child," which "pale[s] into insignificance when we compare the health needs of th[e] child . . . ." (citation and internal quotation marks omitted)).

745 (Iowa 1981)). In this case, Silverio's overall track record is not a good one, including termination of his parental rights to another child, six founded child abuse reports, drug-related convictions, and incidents of domestic abuse. We credit Silverio for important changes he has made. But until he confronts his drug abuse issues, we share the views of the judge on the scene that "his prognosis is poor."[8]

## V. Conclusion.

For the foregoing reasons, we vacate the opinion of the court of appeals and affirm the juvenile court's judgment terminating Silverio's parental rights to A.B. and S.B.

**COURT OF APPEALS DECISION VACATED; JUVENILE COURT JUDGMENT AFFIRMED.**

---

[8]Under the three-step process set forth in the statute, once a ground for termination has been proved under section 232.116(1), and the factors under section 232.116(2) favor termination, the court should then decide whether it need not terminate the relationship for any of the reasons set forth in section 232.116(3). *P.L.*, 778 N.W.2d at 40–41. Here, Silverio has not referenced section 232.116(3) in his petition on appeal, although he has asserted there is a bond between the two children and himself. *See* Iowa Code § 232.116(3)(*c*) (providing that the court need not terminate the relationship between the parent and the child if the court finds "[t]here is clear and convincing evidence that the termination would be detrimental to the child at the time due to the closeness of the parent-child relationship"). Assuming without deciding that Silverio's reference is sufficient to raise the issue, we concur in the juvenile court's view that there is a bond between Silverio and A.B. and S.B., but the children's safety, long-term nurturing and growth, and physical, mental, and emotional needs would be better served by termination of parental rights notwithstanding that bond. *See D.W.*, 791 N.W.2d at 709 (holding that in analyzing this exception, "our consideration must center on whether the child will be disadvantaged by termination, and whether the disadvantage overcomes [the parent's] inability to provide for [the child's] developing needs").