**IN THE COURT OF APPEALS OF IOWA**

No. 14-0116
Filed April 16, 2014

**IN THE INTEREST OF T.C.,**
**Minor Child,**

**L.C., Mother,**
    Appellant.
_____

Appeal from the Iowa District Court for Polk County, Joe E. Smith, Judge.

A mother appeals the juvenile court order terminating her parental rights.

**AFFIRMED.**

Nicholas Bailey, Altoona, for appellant mother.

Thomas J. Miller, Attorney General, Kathrine Miller-Todd, Assistant Attorney General, John P. Sarcone, County Attorney, Jennifer Galloway, Assistant County Attorney, for appellee State.

Michael Sorci of the Youth Law Center, Des Moines, for minor child.

Considered by Danilson, C.J., and Vaitheswaran and Mullins, JJ.

**MULLINS, J.**

A mother appeals a juvenile court order terminating her parental rights to one child, T.C., under Iowa Code sections 232.116(1)(d), (h), and (*l*) (2013). She argues the State failed to show sufficient evidence to terminate, and a statutory exception under section 232.116(3) applied to prevent termination. We affirm.

## I.      Facts and Background Proceedings.

The mother has a long history of drug and alcohol abuse, using on a daily basis. She also has a long history of selecting unsafe men as associates, oftentimes abusing drugs with them. The child in interest, T.C., was born in May 2010. In December 2012, the mother and T.C. were living between her grandfather's home and the home of an intimate partner, George. While living with George, the mother used methamphetamine regularly with T.C. present. While she was high, the mother allowed strangers who were also present in the home to care for T.C. In December 2012, there was a domestic incident in which the mother claimed George assaulted and raped her and refused to allow her to leave the house. She claimed George super-glued a methamphetamine pipe to her hand and forced her to smoke it. She later admitted she had lied about being forced to smoke the methamphetamine. T.C. was present in the home during this incident. The mother adamantly denied that T.C. saw any sexual activity between herself and George during their relationship but admits she was high on methamphetamine, and her perception of events at that time is hazy.

As a result of the December incident, the department of human services (DHS) became involved in the case and removed T.C. from the mother's care, placing her with an aunt and uncle. The juvenile court adjudicated T.C. a child in

need of assistance (CINA) on February 5, 2013. In the adjudication order, the juvenile court found the mother's failure to seek substance abuse treatment and her unresolved mental health issues presented a danger to T.C. if she were returned to the mother's care. The DHS continued to be concerned about the mother's relationships with various men. These relationships presented a negative influence to return to drugs and alcohol and exposed the mother to the risk of violence. In June 2013, DHS removed T.C. from the aunt and uncle following a founded child abuse report against the uncle. DHS placed T.C. with another foster family where she has resided since that time.

Following T.C.'s removal in December 2012, the mother ended her relationship with George and began living with a man named Chris. She lived there until February 2013, when there was another domestic assault incident and she moved out. In February, the mother entered MECCA and successfully completed a twenty-one-day program. However, she relapsed only two weeks later and admitted to getting high in a park with a man named Harris, using methamphetamine, marijuana, and alcohol.

In March, she began a relationship with Joshua. Joshua also was a drug user, had a criminal record, and his parental rights to his own children had been terminated. The mother had used drugs with Joshua in the past. At one point during their intimate relationship, the mother feared she had gotten pregnant by Joshua.

In April, the mother entered Hope Ministries and began their "Christ-based" recovery program. Hope Ministries operates a Christian "life recovery" program and is not certified to provide substance abuse counseling. The mother

tested positive for methamphetamine when entering Hope Ministries and admitted she had been using off-and-on until that time. However, thereafter and until the date of the termination hearing, the mother gave all clean drug tests. Participants in the Hope Ministries residential program face a number of restrictions as they meet with counselors and attend classes. Intimate relationships are strictly forbidden as counselors teach the participants how to engage in appropriate relationships. Participants are required to remain in the facility. However, they are permitted to use "home passes." They must sign out and in and indicate where they will be. As part of the program, participants are not permitted to be around people who are actively using drugs or have a history of use.

While at Hope Ministries, the mother received substance abuse counselling through House of Mercy as an outpatient. The substance abuse counselor testified she did not consider someone who continued to associate with drug users as someone in recovery. She considered such behavior risky for a person with a drug history. The mother did not inform the substance abuse counselor that she was engaging in such behavior. The counselor also stated she recommended the mother engage in the inpatient substance abuse program but she had not done so. The mother had not attended outpatient treatment consistently because of scheduling conflicts with Hope Ministry's program. The mother also refused to discuss her drug use history. The counselor testified this placed her at a higher risk of relapse.

During the earliest stages of the Hope Ministries program, the mother continued her relationship with Joshua. She did not disclose to any staff at Hope

Ministries she was in this relationship. Their relationship ended sometime in May or June. In August, she began another relationship with Bruce. The mother had known Bruce for several years. Bruce had ongoing substance abuse issues, and the mother had used drugs with him in the past. She admitted to concealing the relationship and lying about it with staff, counsellors, and DHS. Hope Ministries staff later discovered the mother used her home passes to see Bruce and lied about where she was. On one occasion, Bruce and the mother went to see a friend of Bruce's, from whom Bruce purchased drugs. The mother testified she was unaware this was the purpose of the visit and left the area on her own. The relationship with Bruce lasted about a month, and the mother did not inform staff of it until the end of September.[1] Also in August, Hope Ministries staff graduated the mother from the beginning recovery program to the more advanced program. The Hope Ministries counsellor admitted had they known the mother was maintaining an inappropriate relationship they would not have graduated her.

While at Hope Ministries, the mother also sought mental health treatment. She saw a psychiatrist and received medication for her mental health issues. She had received several diagnoses including post-traumatic stress disorder and bipolar disorder. The juvenile court had ordered the mother to see a mental health therapist to address the behaviors that led to her associating with dangerous and unhealthy men. At the time of the termination hearing in November 2013, she had not been seeing a therapist regularly. She also

---

[1] It is difficult to determine the precise dates of these relationships because the mother concealed them from Hope Ministry's staff and DHS who later learned about them and confronted her.

admitted that a barrier to her successful treatment was that she had lied to her therapists about her behaviors. The family safety, risk, and permanency (FSRP) worker testified she thought the mother had made progress but still had a lot of work to do.

Shortly after the December 2012 removal, the DHS worker noted behavior in T.C. that concerned her. The DHS worker testified upon first meeting her, T.C. wanted to sit in her lap and give her a hug. The child therapist also testified at their first meeting, T.C. wanted to sit on her lap and asked for hugs and kisses. The mother indicated this was typical behavior for T.C. and that she was a friendly child. The DHS worker and the child therapist were concerned because T.C. appeared willing to approach complete strangers. During a visitation under FSRP supervision, the mother encouraged T.C. to hug a man she had met at MECCA, a drug addict, whom T.C. had never met before.

In August, T.C. began seeing a child therapist after she began to exhibit "sexualized behavior" including attempting to insert objects into the genital areas of her dolls. The child therapist testified typically children of that age— approximately three years old—have seen such behavior elsewhere before imitating it. The therapist could not identify the origin of these behaviors but stated they could stem from T.C. being exposed to sexual behavior during the mother's relationships or from witnessing abuse in the aunt and uncle's home.[2] The therapist also testified T.C. demonstrated unusual "emotional reactivity,"

---

[2] While T.C. was in the aunt and uncle's home, the aunt discovered her own daughter had been sexually abused by a neighbor's child. The therapist speculated that perhaps T.C. had witnessed this.

meaning she would easily get upset over small matters and had difficulty with transitions.

The mother had semi-supervised visitation with T.C. at Hope Ministries twice a week for two hours each visit. She was not permitted to leave the facility with T.C. She also had three overnight visits. Each visit reportedly went well. The FSRP worker testified the mother and T.C. have a good rapport, and the mother provided adequate structure and appropriate activities. The Hope Ministries counselor testified she did not believe the mother was in a position to assume care of T.C. The counselor thought this might be possible in two months' time. The FSRP worker testified she thought T.C. and the mother were very bonded, and it would be very hard on T.C. not to see her mother. However, she also testified T.C. needs a stable lifestyle, particularly after having been removed from her mother, then moved from her aunt's home to the foster home. She also stated she was not comfortable enough with the mother's progress to recommend returning T.C. to the mother. The child therapist also testified another transition would be detrimental to T.C. The mother testified she planned to remain in the Hope Ministry's program, which will last two years. During that time, she will be restricted from leaving the facility. The Hope Ministry counselor testified the mother would not be able to take T.C. to medical or therapy appointments outside the facility.

In June 2013, following a permanency review hearing, the juvenile court ordered the State to file a petition to terminate the mother's parental rights. The State did so in July, and the court set a pre-trial hearing for August 21, 2013. At the August 21, 2013 hearing, the court continued the termination trial to

November. At the time of the hearing, T.C. was three-and-one-half years old. The juvenile court found statutory grounds sufficient to terminate the mother's parental rights under Iowa Code section 232.116(1)(d), (h), and (*l*). The mother appeals.[3]

## II.    Standard of Review.

We review a juvenile court order terminating parental rights de novo. *In re A.B.*, 815 N.W.2d 764, 773 (Iowa 2012). We give weight to the factual determinations of the juvenile court, especially with regard to witness credibility, but are not bound by them. *Id.* Our primary consideration is the best interests of the child. *Id.* at 776.

## III.    Analysis.

We will uphold the termination of parental rights where there is clear and convincing evidence of the statutory grounds for termination. *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010). Evidence is clear and convincing when there are no serious or substantial doubts as to the correctness of conclusions of law drawn from the evidence. *Id.*

### A.    Statutory Grounds.

The mother first argues that there was insufficient evidence to terminate under the statutory grounds alleged. When the juvenile court terminates parental rights on more than one statutory ground, we need only find grounds to terminate under one of the cited sections to affirm. *In re J.A.D.-F.*, 776 N.W.2d 879, 884

---

[3] T.C.'s father was also a subject of the termination petition. The juvenile court found he had never been involved in T.C.'s life in any way and terminated his rights under Iowa Code section 232.116(1)(b). He does not appeal.

(Iowa Ct. App. 2009). Here, we focus on the evidence supporting the court's termination of the mother's parental rights under Iowa Code section 232.116(1)(h). To terminate parental rights under Iowa Code section 232.116(1)(h), the State must show by clear and convincing evidence the child is three years old or younger,[4] has been adjudicated a child in need of assistance, has been removed from the parent's care for at least the last six consecutive months,[5] and cannot be returned to the parent's custody at the time of the termination hearing.

The mother argues the circumstances leading to T.C.'s removal no longer exist because she has been sober for over seven months, with no positive drug screens. She asserts she can now parent T.C. safely. The evidence at the termination hearing discloses, until very recently, the mother has chosen to associate with men who are involved in illicit drug culture and who pose an increased risk of violence for the mother and T.C., even up to and including the month of August, after the termination petition was filed. Her choices of associates who are using illegal drugs also places her at a higher risk of relapsing, which she has already done once before, only two weeks after completing treatment at MECCA. She is not progressing in substance abuse treatment because of her refusal to discuss her past drug use. She has admitted to lying to police, Hope Ministries, her substance abuse counselor, the FSRP

---

[4] For termination of parental rights, the child's age is determined upon the date of completion of the termination hearings. *In re N.N.*, 692 N.W.2d 51, 53 (Iowa Ct. App. 2004). We recognize T.C. was beyond her third birthday during the termination hearings. Nonetheless, Iowa Code section 232.116(1)(h) is applicable to a child who is three but not yet four. *Id.* at 53-54.

[5] Or six of the last twelve months. Iowa Code § 232.116(1)(h).

worker, and the DHS worker about various matters, including her conduct, activities, and whereabouts. Under these circumstances, and considering the impact her behavior has already had on T.C., we find the evidence clear and convincing that T.C. cannot be returned to the mother's care at this time.

**B.      Statutory Exception.**

The mother next argues the juvenile court erred in terminating her parental rights because, pursuant to Iowa Code section 232.116(3)(c), termination was more detrimental to T.C. than any danger posed by not terminating. Termination of parental rights follows a three-step analysis. *In re P.L.*, 788 N.W.2d 33, 39 (Iowa 2010). First, the court must determine if a statutory ground for termination exists under Iowa Code section 232.116(1). *Id.* Second, the court must give consideration to the child's best interests, including the child's safety, the best placement for furthering the long-term nurturing and growth of the child, and the physical, mental, and emotional condition and needs of the child. *See* Iowa Code § 232.116(2). Finally, the court need not terminate parental rights if it finds any of the statutory exceptions under Iowa Code section 232.116(3) apply. *P.L.* 778 N.W.2d at 39.

The State argues the mother failed to preserve this argument because the termination order did not address this issue. Generally, issues raised on appeal must first be raised in the trial court. *In re A.B.*, 815 N.W.2d 764, 773 (Iowa 2012.) This rule also applies in the context of CINA and termination-of-parental-rights proceedings. *Id.* Where, as here, the juvenile court failed to make a written finding of fact or conclusion of law, "[t]he findings and conclusions may be enlarged or amended and the judgment or decree may be modified upon timely

posttrial motion [pursuant to Iowa R. Civ. P. 1.904(2)]." *In re A.M.H.*, 516 N.W.2d 867, 872 (Iowa 1994). Failure to file such a motion waives any challenges to the deficiency in the court's termination order. *Id.* Here, although the juvenile court did consider the best interests prong of the termination analysis, it did not make a determination addressing whether any statutory exception applied. The mother did not make any further motion to amend and enlarge the court's findings. Therefore, the issue was not preserved for appeal, and we do not address it.

**IV.    Conclusion.**

Upon our de novo review, we find there was clear and convincing evidence for termination of the mother's parental rights under Iowa Code section 232.116(1)(h). The mother's statutory exception argument was not preserved for appeal. Therefore, we affirm the juvenile court order.

**AFFIRMED.**