# IN THE COURT OF APPEALS OF IOWA

No. 20-1161
Filed November 30, 2020

**IN THE INTEREST OF T.W., B.W., and B.W.,**
**Minor Children,**

**J.W., Father,**
        Appellant,

**V.W., Mother of B.W. and B.W.,**
        Appellant.
_____

        Appeal from the Iowa District Court for Clinton County, Phillip J. Tabor,

District Associate Judge.


        A mother and father separately appeal the termination of their parental

rights.  **AFFIRMED ON FATHER'S APPEAL; REVERSED ON MOTHER'S**

**APPEAL.**


        Patricia A. Rolfstad, Davenport, for appellant father.

        G. Brian Weiler, Davenport, for appellant mother.

        Thomas J. Miller, Attorney General, and Meredith L. Lamberti, Assistant

Attorney General, for appellee State.

        Victoria Noel of The Noel Law Firm, P.C., Clinton, attorney and guardian ad

litem for minor children.


        Considered by Bower, C.J., and Vaitheswaran and Greer, JJ.  Tabor, J.,

takes no part.

**VAITHESWARAN, Judge.**

A mother and father appeal the termination of their parental rights to two children, born in 2016 and 2017.  The children's father also appeals the termination of his parental rights to a third child, born in 2010.

## I.     Grounds for Termination

Both parents contend the State failed to prove the statutory grounds for termination cited by the district court.

### A.     Mother

As noted, the mother and father had two children together.  The younger child was born with low oxygen, and medical staff had problems getting intravenous oxygen started.  The child was immediately airlifted to the University of Iowa Hospitals and Clinics.  According to the mother's therapist, these traumatic circumstances surrounding the child's birth informed subsequent events.

When the child was one year old, she was hospitalized for gastrointestinal issues.  Medical staff inserted several tubes and performed various procedures, some of which were later deemed unnecessary.  A physician reported that the mother provided "false and exaggerated information about [the child's] symptoms" and this was "a clear case of Munchausen Syndrome by Proxy which is now called 'factitious disorder imposed on another.'"  The department of human services intervened.

The parents agreed to have the child placed with a relative.  The parents' older child remained at home under a safety plan that restricted the mother to supervised contact.

In time, the State filed a child-in-need-of-assistance petition. The district court adjudicated the children in need of assistance under several statutory provisions. Shortly thereafter, the children's guardian ad litem reported that the parents were "in complete denial regarding the abuse perpetrated by [the mother] on [the younger child]." In a dispositional order, the court left the younger child with the relative and transferred the older child to the custody of his paternal grandmother.[1] The court also required supervision of parental visits. The State ultimately filed a petition to terminate parental rights.

Following a hearing, the district court found that "the adjudicatory harm in this matter was "[f]actitious [d]isorder on [a]nother." The court further found, "The mother [would] not admit that her actions were the reason for the underlying adjudication." The court terminated the mother's parental rights pursuant to Iowa Code section 232.116(1)(d), (h), and (i) (2019).

The mother takes issue with the district court's finding that she failed to acknowledge the harm she caused her younger child. She asserts that, "In fact, [she] and her therapist testified at length about her recognition and understanding of the harm to her child." The State responds that the mother did not "sufficiently address[] the underlying why of her . . . [d]isorder." In its view, the mother needed "to acknowledge that her actions constituted child abuse."

"[T]he court may not compel [a parent] to admit . . . guilt in order to be eligible to regain custody of [a child]." *See In re C.H*, 652 N.W.2d 144, 149 (Iowa 2002). "The court may, however, require [a parent] to comply with the case

---

[1] That child was later transferred to the home of the relative caring for the younger child.

permanency plan which includes treatment" and "[f]ailure to do so may result in termination of his parental rights." *Id.*

The department of human services case plan required the mother to meet with an in-home service provider and participate in the "Safe Care" parenting curriculum, obtain a psychological evaluation, cooperate with any recommended mental-health treatment services, and attend couples counseling. At the termination hearing, one of the department employees overseeing the case did not dispute that the mother participated in these services but asserted she simply checked the boxes without internalizing what she learned. The employee testified the mother attended therapy sessions but failed to really engage in them and she failed to "acknowledge[] that [the youngest child] was harmed due to her actions." A service provider similarly stated the mother "still hasn't recognized that her overreacting to the doctor caused harm to the [child]."

The mother directly contradicted this testimony. She stated, "I agree that I over-reported and it caused harm to [the child]." Later, she was asked if she understood her overreactions caused her child harm. She responded, "Yes."

The mother underscored the significance of the difficult birth on her later actions. She testified she was required to take the child to the hospital every other week for the first six months, to follow-up on "the initial problems." She conceded that, after that point, "every little spit-up, every little puke, every little everything" became "alarming" to her and she began "over-informing" the doctors about the child.

Recognizing her severe anxiety about the welfare of the child, the mother sought therapy even before the department intervened. She continued with that

therapy throughout the proceedings, even after successfully completing a special protocol to address the birth trauma. She believed her therapist informed the department of her successful completion of the protocol more than nine months before the termination hearing. She also noted that the therapist attended a family team meeting several months before the termination hearing and informed department personnel of her ability to serve as a safe caretaker.

The mother's therapist confirmed the mother's testimony. She reported:

[The mother] has made therapeutic progress throughout my time of providing services to her. [She] has been consistent in attending her sessions and is actively engaged in her therapeutic services. At this time I have no concerns regarding [her] mental health or her ability to healthily regulate her emotions as they arise.

At the termination hearing, the therapist testified she worked with the mother "behaviorally" on what would cause her "to report every little thing" to "help [her] not [to] be as hypersensitive when [the child] does show a symptom . . . . And so then [the mother] is able to stop, look, look at the symptoms, and maybe take it more of a step at a time versus immediately going into a fight or flight mode." When asked if she had "any significant concerns about" the mother's emotional health or behavioral effects that her emotional health might trigger," she responded, "No, I don't." She also agreed the youngest child's traumatic birth had a logical relationship to over-reporting of medical symptoms.

In sum, the mother voluntarily sought therapy to address the anxiety that led to over-reporting; successfully completed a therapeutic protocol directed at the underlying cause of that anxiety; categorically admitted to the harm the over-reporting of symptoms caused her younger child; and came to the termination hearing with a recommendation from her long-term therapist that she would be a

safe caretaker. To have required the mother to also admit to committing child abuse would have run afoul of the Fifth Amendment right against self-incrimination, discussed in *C.H. See id.*[2] We conclude the mother's refusal to incriminate herself could not serve as grounds for terminating her parental rights where she fully followed the case plan requirements including the department's requirement that she admit to harming the child. We turn to the remaining factual grounds cited by the State to support termination of her rights.

The service provider who worked with the mother on the "Safe Care" parenting curriculum testified the mother failed to complete the modules. However, the service provider conceded she had to curtail in-person contact with the mother two and one-half months before the termination hearing in light of the COVID-19 pandemic. The provider also conceded the mother followed an example in one of the modules concerning treatment at home versus treatment in an emergency room. Specifically, during a semi-supervised visit with her older child, the mother determined the child had a fever and she contacted the service provider to confirm her preliminary determination that the child should be taken to the emergency room. The service provider assured her that was the proper course of action in this circumstance. When asked if the mother "did everything properly," the provider responded, "Yes." As for the provider's testimony that the mother failed to heed home safety admonitions contained in one of the modules, she could point to little more than hanging cords as supporting evidence. The mother explained

---

[2] The mother testified that her prior attorney told her not to make such an admission.

that her home did indeed have cords for certain appliances including her phone and "there [was] no way we can hide all those cords."

Notably, the parents' home was deemed appropriate for semi-supervised in-person visits with the children. Those visits occurred three days a week, with Sunday visits running six hours. Supervision was limited to twenty to thirty minute drop-ins by the service provider. Visits continued on that schedule until the onset of the COVID-19 pandemic, which resulted in the cancellation of in-person contact in March, April, and part of May 2020. A department employee who took over the case testified that during the three visits she attended, she did not discern any safety concerns or any concerns with the home environment.

Finally, the service provider pointed to the mother's difficult marital relationship as a ground for termination. Neither she nor the department employee overseeing the case reported any concerns with domestic violence in the home. Their testimony coincided with the mother's testimony that the father did not physically or verbally abuse her. According to department reports, the stressor was the uncertain custody status of the father's oldest child, a factor the mother openly addressed with department personnel.

By the time of the termination hearing, the parents had agreed to divorce but, in light of financial burdens caused by the COVID-19 pandemic, continued to live together without incident. We agree with the district court that the parents' "current marital status" was "irrelevant to a placement decision."

That said, the department also asserted the mother's conceded anxiety about the marital relationship was a factor to consider in the termination decision. Assuming without deciding this type of anxiety was a legitimate factor, the mother

worked hard to address it. She attended marriage counseling as required by the case plan, and her marriage counselor reported she "was engaged and forthcoming" and "demonstrated a willingness to do what was required by DHS in order to be reunified with her children." She also heeded a department employee's instruction to address marital stress in individual therapy.

After setting aside the department's reliance on the mother's refusal to admit to commission of a crime and its reliance on the parents' marital status, we find scant evidence to support the remaining factual grounds for termination cited by the State. We turn to the legal grounds cited by the district court.

Iowa Code section 232.116(1)(h) requires proof of several elements, including proof a child cannot be returned to parental custody. The mother testified she was able to have the children returned to her care immediately. She also stated she had a good relationship with the relative who was serving as caretaker and the relative was supportive of having the children returned to her care. The fact that lengthy visits took place in the home without incident and with minimal supervision supports her belief. We conclude the State failed to prove by clear and convincing evidence that the children could not be returned to parental custody under section 232.116(1)(h)(4).

We turn to section 232.116(1)(d). That provision requires the State to prove:

> (1) The court has previously adjudicated the child to be a child in need of assistance after finding the child to have been physically or sexually abused or neglected as the result of the acts or omissions of one or both parents, or the court has previously adjudicated a child who is a member of the same family to be a child in need of assistance after such a finding.

(2) Subsequent to the child in need of assistance adjudication, the parents were offered or received services to correct the circumstance which led to the adjudication, and the circumstance continues to exist despite the offer or receipt of services.

Iowa Code § 232.116(1)(d). The State proved the first element. The district court adjudicated the children under several provisions, including section 232.2(6)(b)(2), which defines a child in need of assistance as a child "[w]hose parent, guardian, other custodian, or other member of the household in which the child resides has physically abused or neglected the child, or is imminently likely to abuse or neglect the child." A founded child abuse assessment supports the adjudication.

The State did not prove the second element. The mother received services to correct the circumstances that led to the adjudication—namely her over-reporting of the younger child's symptoms—and, according to her therapist, those circumstances no longer existed. We conclude the State failed to prove by clear and convincing evidence that termination of the mother's parental rights was warranted under section 232.116(1)(d).

That leaves section 232.116(1)(i), which requires proof:

(1) The child meets the definition of child in need of assistance based on a finding of physical or sexual abuse or neglect as a result of the acts or omissions of one or both parents.
(2) There is clear and convincing evidence that the abuse or neglect posed a significant risk to the life of the child or constituted imminent danger to the child.
(3) There is clear and convincing evidence that the offer or receipt of services would not correct the conditions which led to the abuse or neglect of the child within a reasonable period of time.

Again, the State failed to prove the third element. The mother was offered reunification services, she participated in those services, and the services—in

particular the individual therapy she received—corrected the condition that led to the abuse of her younger child.

Because the State failed to prove the grounds for termination of the mother's parental rights cited by the district court, we reverse the termination order with respect to her. In light of the reversal for failure to establish the statutory grounds, we find it unnecessary to address the remaining arguments raised by the mother.

### B.    Father

The district court terminated the father's parental rights to his three children pursuant to Iowa Code section 232.116(1)(d), (f), (h), and (i). The father contends the State failed to prove the grounds for terminating his parental rights to his younger two children. We find it necessary to address only one of the grounds— section 232.116(1)(h)—which, as noted, requires proof of several elements, including proof the children cannot be returned to parental custody. *See In re A.B.*, 815 N.W.2d 764, 774 (Iowa 2012).

The children were removed from the father's care because he lacked sufficient protective capacity. Although he participated in individual therapy to address the concern, the father's therapist testified he "didn't particularly want to be there" and, although he was not "uncooperative, he was not particularly forthcoming." The therapist opined therapy was not beneficial. After five sessions, it was determined that the father "had reached maximum benefits from the treatment."

The father's failure to address the concern that led to removal of the children from his care was compounded by his minimal involvement in couples counseling,

assuming the goal of that counseling was to enhance the parents' joint protective capacities. The marriage counselor reported he "was not an active participant and did not engage in the process."

The father's parenting skills also were a concern. A department employee characterized them as "subpar." The father had "limited engagement" with the children during visits and "it appeared that it was more . . . Mom [who] engaged with the children than Dad." When visits went virtual, the father failed to participate.

We conclude the State proved the elements of Iowa Code section 232.116(1)(h). The younger two children could not be returned to the father's custody at the time of the termination hearing.

## II. Best Interests

The father contends termination of his parental rights to his oldest child was not in the child's best interests. *See* Iowa Code § 232.116(2). On our de novo review, we disagree.

The oldest child began living with his paternal grandmother before the department became involved. The child experienced several profoundly traumatic events in his young life. The department planned to help him process the trauma in the safety of his grandmother's home and with the assistance of therapy. The father declined to participate in his son's counseling sessions.

The father initially was able to see the child whenever he wanted. Three months before the termination hearing, the department ended those visits out of "concern that every time [the child] saw his father . . . that it was re-traumatization." In light of that re-traumatization, we conclude termination of the father's parental rights to the oldest child was in the child's best interests.

The father also argues termination of his parental rights to the younger two children was not in their best interests. *Id.* The father's failure to engage in reunification services meant that the children's safety would be compromised in his independent care. That fact alone leads us to conclude that termination was in the children's best interests.

### III. Due Process

The father contends the district court violated his due process rights during the termination hearing by not allowing him to obtain a transcript of the permanency hearing at state expense and by truncating questioning of certain witnesses. His constitutional argument was not preserved for review. *In re M.A.F.*, 679 N.W.2d 683, 685 (Iowa Ct. App. 2004) ("Under our rules of civil procedure, an issue which is not raised before the juvenile court may not be raised for the first time on appeal."). Accordingly, we decline to address it.

We affirm the termination of the father's parental rights to his three children. We reverse the termination of the mother's parental rights to her two children.

**AFFIRMED ON FATHER'S APPEAL; REVERSED ON MOTHER'S APPEAL.**