# IN THE COURT OF APPEALS OF IOWA

No. 18-1059
Filed September 12, 2018

**IN THE INTEREST OF B.C.,**
**Minor Child,**

**S.C.,**
     Appellant.
_____

     Appeal from the Iowa District Court for Decatur County, Monty W. Franklin, District Associate Judge.

     The father appeals from the termination of his parental rights. **AFFIRMED.**

     Adam E. Kehrwald of Kehrwald Law Firm, Des Moines, for appellant father.

     Thomas J. Miller, Attorney General, and Kathryn K. Lang, Assistant Attorney General, for appellee State.

     Shireen L. Carter of Shireen Carter Law Office, PLC, Norwalk, guardian ad litem for minor child.

     Considered by Danilson, C.J., and Vogel and Tabor, JJ.

**DANILSON, Chief Judge.**

The father appeals the termination of his parental rights to B.C., born in 2011.[1] The juvenile court terminated the father's parental rights pursuant to Iowa Code section 232.116(1)(e) and (f) (2018). It also found termination was in the child's best interests. When the juvenile court finds more than one ground for termination under section 232.116(1), "we may affirm . . . on any ground we find supported by the record." *In re A.B.*, 815 N.W.2d 764, 774 (Iowa 2012). Upon our de novo review, *see In re A.S.*, 906 N.W.2d 467, 472 (Iowa 2018), we find clear and convincing evidence supports termination under section 232.116(1)(f). We, therefore, affirm.

We first note the child was involved with juvenile court child-in-need-of-assistance (CINA) proceedings before, from August 2013 to December 2014, as a result of parental substance abuse and safety concerns resulting from inadequate parental supervision. That case was closed, and the child was placed in his father's custody.

The child came to the attention of the department of human services (DHS) again in February 2016 when law enforcement executed a search warrant at the father's residence where B.C. and his fifteen-year-old brother resided with the father. The children did not know where the father was or how to contact him. During the search, law enforcement found methamphetamine, marijuana, drug paraphernalia (pipes and needles), and homemade alcohol, along with numerous items of stolen property in the home. A founded child protective assessment was

---

[1] The mother's parental rights were also terminated. She does not appeal.

made for denial of critical care, failure to provide proper supervision, with the father as the responsible party.

A CINA petition was filed and, initially, B.C. was allowed to remain in the father's physical custody. The father was to cooperate with services, including substance-abuse and mental-health evaluations and treatment services; parent-skill development; Family Safety, Risk, and Permanency (FSRP) services; drug testing; and case management services. However, on November 4, 2016, the father was arrested and incarcerated for additional criminal charges. The child lived with two different relatives before being placed with a foster family on April 24, 2017, where he remained throughout the termination proceedings.

Under section 232.116(1)(f), the court may terminate parental rights if a child four years or older has been adjudicated a CINA, has been removed from the physical custody of the parent for at least twelve of the last eighteen months or the last twelve consecutive months, and cannot be returned to the parent's custody at the present time. There is no question the child is older than four years of age, was adjudicated a CINA on June 21, 2016, and has been removed from the father's custody for more than twelve consecutive months. The father argues, however, he can care for his child at present because he has graduated from the Salvation Army program, is living with his parents, and can obtain employment in the near future.

We agree with the trial court that the child cannot be returned to the father at present without risk of adjudicatory harm. We adopt the following findings and conclusions of the court:

[The father] sporadically participated in outpatient substance abuse treatment and did provide negative samples for two drug tests. A drug test on February 17, 2017, was not valid as the temperature of the urine sample was "off" and when required to retest on February 24, 2017, [the father] was unable to provide a urine sample for testing. At his sentencing proceeding held on April 14, 2017, when [the father] was sent to prison, [the father] admitted that he would likely test positive for both marijuana and methamphetamines if he were to be tested on that day. Following his release from prison in August of 2017, [the father] attended a few sessions of substance abuse treatment until he was arrested on additional new charges in October 2017. During this time period he did not test positive for controlled substances but did test positive for using alcohol. Since November 6, 2017, until recently, [the father] has been residing in a community-based correctional residential program at the Salvation Army Rehabilitation Center . . . as a requirement to continue his parole and avoid revocation of parole and return to prison. He has participated in substance abuse education and relapse prevention programming at this facility and has passed all required drug testing.

[The father] failed to obtain a mental health evaluation until December 2016 following [B.C.]'s removal from his custody. He reported to DHS that the evaluation did not recommend any treatment services, but DHS was never provided with a copy of the evaluation and was not able to verify that additional mental health services were not recommended for him. In October 2017, following additional concerns and numerous additional criminal charges, [the father] was required to obtain a new mental health evaluation, but he failed to do so, and since [B.C.]'s adjudication as a CINA in June of 2016, he has not participated in any mental health treatment services other than possibly the initial evaluation he indicates was completed in December 2016.

The father's contact with the DHS and the child has been adversely affected by his criminal proceedings and sentences as noted by the juvenile court:

[The father]'s contact with the DHS case manager and with the FSRP provider has been sporadic from the time of [B.C.]'s removal until [the father] was sentenced to prison in April 2017. After he was released on parole, [the father] resumed his limited contact with DHS and the FSRP provider until he was again arrested in October 2017 when all contact with them ceased. Since October 2017 [the father] has had no contact with DHS or with the FSRP provider other than during the court hearing held February 19, 2018, and at a Foster Care Review Board meeting held April 4, 2018.

Initially, [B.C.] was allowed to remain in [the father]'s custody following his adjudication and until [the father] was re-arrested on

new criminal charges on November 4, 2016. Thereafter, until he was sent to prison on April 14, 2017, [the father]'s visits or contacts with [B.C.] were to be supervised, primarily by his cousin . . . with whom [B.C.] was living from December 1, 2016, until April 24, 2017. After [the father]'s sentencing, it was discovered that [the father] and [his cousin] were ignoring the supervision requirement for visits as required by DHS and the court's order and [the father] was having unsupervised contact with [B.C.] whenever he wanted. This resulted in [B.C.]'s placement in family foster care on April 24, 2017.

[The father]'s last face-to face contact or visit with [B.C.] was at his sentencing on April 14, 2017. Following [the father] being sent to prison, [B.C.]'s therapist recommended that visitations be limited to letters and telephone calls. No such communication took place until [the father] was paroled and not in custody during September and October 2017 when there were approximately three letters and telephone calls between [the father] and [B.C.] made in a therapeutic setting. After [the father] was once again arrested in October 2017, the letters and telephone calls ceased; and at the permanency review hearing held October 30, 2017, when [B.C.]'s permanency goal was changed by the court to termination of parental rights, the court ordered that visitation with both parents be suspended until [B.C.]'s therapist recommended that visits be recommenced. To date, [B.C.]'s therapist has not made a recommendation that visitation or any contact between [B.C.] and his parents should take place. [The father], therefore, has had no contact of any nature with [B.C.] since October 2017 (six months), and except for approximately three letters and telephone calls, [the father] has had no contact with [B.C.] since April 14, 2017 (twelve months).

Most recently, the father has completed the Salvation Army program, but

significant issues remain as noted by the juvenile court:

After sixteen months of noncompliance with services, [the father] recently completed the Salvation Army program under the threat of having his parole revoked and being returned to prison. Although this program apparently has components for drug education, relapse prevention, and AA/NA meetings, it does not appear to be an accredited substance abuse treatment program. Therefore, there is still some question as to whether or not [the father] has appropriately addressed his substance abuse problem. Also, there does not appear to be any mental health treatment service component to this program, so [the father] still has not yet appropriately addressed his mental health concerns. There is also no indication that this program provides any parent-skill development programming so that concern has also not yet been addressed by [the father].

Parent-skill development is especially important for [the father] as he has never given any indication that he recognizes or in any way appreciates the adverse effects that his chaotic, unstable, and criminal lifestyle has had on his children. For example, [the father] showed no hesitation in attempting to blame his fifteen year old son . . . for the contraband discovered in the home at the beginning of the CINA proceeding. He likewise had no qualms about having his then five-year-old son [B.C.] be present for his felony sentencing proceeding and even having [B.C.] sit on his lap at the counsel table during the sentencing hearing. As recently as September and October of 2017, [the father] still did not accept any responsibility for any of the impact or consequences that his actions and choices have caused to his children. . . .

[The father] graduated from the Salvation Army program on April 15, 2018, the day before the termination hearing. He testified that he is living in the basement of his parents' house as his house burnt down under suspicious circumstances currently being investigated by the State Fire Marshall's Office. Also living in the home with [the father] and his parents are a nephew and his girlfriend. He does not have a regular job or income but believes that he can work doing odd jobs while he looks for regular employment. He does not have a driver's license. He has a girlfriend who may also be on probation or parole who is pregnant with his child. He remains on parole and has a pending assault charge which, if he is convicted, may have an adverse impact on his parole status.

[The father] has yet to demonstrate that he can live a normal and regular life outside of a highly structured and completely supervised living situation. The last time he tried to do so was when he was released from prison on parole in 2017, and he was only able to last a couple of months before he was facing parole revocation proceedings.

We also agree that the child's best interests lie in the termination of the father's parental rights and adoption. As found by the juvenile court,

[B.C.] has greatly benefited from the stability and structure being provided to him by the foster home and he continues to thrive in this nurturing environment. He is entitled and deserves to continue to receive the benefits currently being provided to him in the foster home and which were not and would not be available to him in the home of either parent where instability, dysfunction, and uncertainty prevail.

Because there is clear and convincing evidence to support termination and termination is in the child's best interest, we affirm the termination of the father's parental rights.

**AFFIRMED.**