# IN THE COURT OF APPEALS OF IOWA

———————————

No. 25-1772
Filed January 7, 2026

———————————

**In the Interest of A.A., A.A., and A.A., Minor Children,**

**A.C., Mother**
Appellant.

———————————

Appeal from the Iowa District Court for Story County,
The Honorable Hunter W. Thorpe, Judge.

———————————

**AFFIRMED**

———————————

Daniela Matasovic of Matasovic Law Firm, Ames, attorney for appellant
mother.

Brenna Bird, Attorney General, and Tamara Knight, Assistant Attorney
General, attorneys for appellee State.

Shannon M. Leighty of the State Public Defender's Office, Nevada,
attorney and guardian ad litem for minor children.

———————————

Considered without oral argument
by Chicchelly, P.J., and Buller and Langholz, JJ.
Opinion by Buller, J.

**BULLER, Judge.**

A mother appeals the termination of her parental rights to three children, who were born in 2022, 2023, and 2024. The father, who was incarcerated during the entire case, does not appeal. The mother challenges two of the grounds for termination, requests additional time, argues termination is not in the children's best interests, and urges the parent-child bond should preclude termination. We affirm.

## BACKGROUND FACTS AND PROCEEDINGS

In August 2024, the mother left the two older children in the care of the maternal grandmother and disappeared for approximately three weeks. When the mother returned, she asked the grandmother to take her to the hospital, where the mother reported taking unprescribed fentanyl and Percocet, even though she was pregnant. The Iowa Department of Health and Human Services (HHS) requested—and the court granted—temporary removal of the older children from the mother's custody and placed them with their grandmother. Around a week later, the mother gave birth; the newborn tested positive for cocaine and fentanyl. The baby was also removed from the mother's care and placed with the grandmother. The mother reported going through depression and attempting suicide. Upon her release from the hospital, the mother disappeared for several months without contacting the children, the maternal grandmother, or HHS.

The mother had no in-person contact with the children from September 2024 until the following May, when she started participating in video calls. She briefly contacted HHS in February from an inpatient substance-abuse treatment program, then had no contact until the end of April, when she began to engage again with HHS.

The mother entered her inpatient treatment program with a recent history of heroin, fentanyl, and methamphetamine use, completing the program in early March. But she did not attend the recommended follow-up outpatient treatment and therapy. And at the end of March she was arrested for operating while intoxicated. In July, she reengaged with substance-abuse treatment, but she did not participate regularly until September. She completed drug tests as part of her treatment program, some of which came back positive for alcohol, and HHS asked her to do sweat patch drug testing after she reengaged in services. By trial, she had completed one sweat patch, started another, and missed five tests. The lone completed test—returned one month before trial—came back positive for cocaine, and she chose not to have the in-progress patch removed at the scheduled time. The mother denied use and blamed the positive result on being "around people who were using cocaine." But she argued she had complied with her treatment-required urine tests "two to three times a week," and that she did not have advance notice of those tests.

As to mental-health concerns, the mother had some treatment while at substance-abuse inpatient treatment, but there was no evidence of any continued mental-health treatment or therapy after her March discharge. The mother attributed her lack of steady treatment to lack of health insurance. She had recently attempted to reconnect to mental health services through her substance-abuse program and accepted alternative referrals, but she had not started any treatment.

The mother began parenting education services through HHS in June and started supervised visits in August. By the termination trial in October, she had only participated in four supervised visits. The HHS worker observed the mother was engaged and did well when she showed up to

education or visits, but she did not consistently attend either. By trial, the mother was living with a maternal aunt and was employed. And she had begun offering some financial assistance for the children's care.

The county attorney, HHS, the children's guardian ad litem, and their court-appointed special advocate all recommended termination of parental rights. The court terminated the mother's parental rights under Iowa Code section 232.116(1)(e), (h), and (*l*) (2025). The mother appeals, and we review her claims de novo. *See In re W.M.*, 957 N.W.2d 305, 312 (Iowa 2021).

## DISCUSSION

"We use a three-step analysis to review termination of parental rights." *In re A.S.*, 906 N.W.2d 467, 472 (Iowa 2018). We consider the statutory grounds for termination, whether termination is in the children's best interests, and whether any permissive exception should be applied. *Id.* at 472–73.

### I. Grounds for Termination

The mother contests the juvenile court's termination of her parental rights under section 232.116(1)(e) and (*l*). "When the juvenile court terminates parental rights on more than one statutory ground, we may affirm the juvenile court's order on any ground we find supported by the record." *In re A.B.*, 815 N.W.2d 764, 774 (Iowa 2012). The mother does not contest the juvenile court's findings terminating her rights under section 232.116(1)(h). Because we agree the elements for termination under paragraph (h) were established by clear and convincing evidence, we affirm termination of the mother's parental rights under that ground.

## II. Additional Time

While the mother did not argue the children could be returned to her care at the time of the termination hearing, *see* Iowa Code § 232.116(1)(h)(4), she argued she would be able to resume care of them with a six-month extension. She considered her recent progress in treatment, stable housing, and employment to provide the necessary basis for the court to order a six-month extension for reunification under Iowa Code section 232.104(2)(b). The mother urged we should consider her current trajectory as indicative of the future and the elimination of the need for removal.

To grant an extension, the court must "enumerate the specific factors, conditions, or expected behavioral changes" persuading the court the removal will no longer be necessary after six months. Iowa Code § 232.104(2)(b). But despite a year of removal, the mother had barely begun her efforts towards resuming care, far beyond the six-month statutory timeframe. *See In re L.A.*, 20 N.W.3d 529, 536 (Iowa Ct. App. 2025) (en banc) (collecting cases where "eleventh hour" efforts did not warrant an extension). The mother has not provided a clean test to HHS, and a positive test a month before termination resulted in her admitting she associated with persons actively using cocaine. Given the mother's uneven substance-abuse treatment history, her lack of progress on mental-health treatment, and the very recent nature of her engagement in services, we are unable to conclude that, even on her current positive trajectory, the need for removal would no longer exist in six months for these three young children.

## III. Best Interests

The mother asserts the juvenile court's best-interests analysis failed to consider the children's safe and stable placement with a relative as the mother works towards reunification in a reasonable time, so termination is

not necessary. But under the statutory framework, this argument cuts against the mother. Iowa Code section 232.116(2) requires the court to give "primary consideration" to the children's safety, long-term placement, and their "physical, mental, and emotional condition and needs." Part of that consideration is their current and possible permanent integration and familial identity with their placement. *See* Iowa Code § 232.116(2)(b). The maternal grandmother took in the three young children—including the abandoned newborn going through withdrawal—and created a safe and stable home for them, seeking services and helping to allow the children to grow and develop as best they can. We find a permanent home in the safe and stable placement with the maternal grandmother offers the best opportunity for the children's growth, and termination of the mother's rights is in their best interests.

## IV.  Permissive Exception

The mother contends she has a strong parent–child bond with all the children, and that "preserving the relationship would better serve the children's long-term emotional interests than severance." She further argues "the juvenile court failed to conduct the required meaningful, case-specific analysis." But the juvenile court found the mother did not argue that the bond should preclude termination. And regardless, the court noted the mother only seeing the children "a handful of times in the last year" after seven months with no contact did not indicate a strong bond that should preclude termination. To the extent error was properly preserved, we agree the mother's behavior did not support a strong parent-child relationship, and what bond does exist is not so strong that severing it would be detrimental to the children.

**AFFIRMED.**