**IN THE COURT OF APPEALS OF IOWA**

No. 19-0003
Filed April 3, 2019

**IN THE INTEREST OF D.S.,**
**Minor Child,**

**H.S., Father,**
        Appellant.
_____

        Appeal from the Iowa District Court for Poweshiek County, Rose Anne
Mefford, District Associate Judge.

        A father appeals the termination of his parental rights to one child.
**AFFIRMED.**

        Landon S. Small of McKelvie Law Office, Grinnell, for appellant father.

        Thomas J. Miller, Attorney General, and Anagha Dixit, Assistant Attorney
General, for appellee State.

        Misty White of White Law Office, Sigourney, guardian ad litem for minor
child.

        Considered by Potterfield, P.J., and Tabor and Bower, JJ.

**TABOR, Judge.**

A father, Henry, appeals the termination of his parental rights to D.S., his one-year-old son. Henry does not contest the statutory grounds supporting termination. He contends only that termination is not in D.S.'s best interests. Because clear and convincing evidence backs the juvenile court's conclusion that adoption is the better permanency outcome for D.S., we affirm.[1]

In September 2017—when D.S. was just three weeks old—his mother, Cassandra, overdosed on prescription pain medications. The Iowa Department of Human Services (DHS) removed D.S. from Cassandra's care and placed the infant with Henry. With the consent of both parents, the juvenile court adjudicated D.S. as a child in need of assistance (CINA).

The placement with Henry was short-lived. Only a month after assuming care of his son, Henry attacked and strangled Cassandra in the presence of D.S. Henry received suspended sentences for domestic abuse impeding air or blood flow causing bodily injury and child endangerment. The juvenile court ordered removal of D.S. from Henry's care in October 2017, and D.S. has since been in foster care.

A no-contact order resulting from his strangulation offense prohibited Henry from interacting with Cassandra throughout the CINA case. The child-endangerment offense likewise resulted in a no-contact order between Henry and

---

[1] We review Henry's claim de novo, which means we adjudicate anew those issues properly preserved and presented. *See In re L.G.*, 532 N.W.2d 478, 480 (Iowa Ct. App. 1995). Although we are not bound by them, we give weight to the juvenile court's factual findings, especially as to witness credibility. *In re M.W.*, 876 N.W.2d 212, 219 (Iowa 2016). "The child's best interests always remain the first consideration." *In re A.S.*, 906 N.W.2d 467, 475 (Iowa 2018) (citation omitted).

D.S., which authorities modified to allow contact during supervised and semi-supervised visitations. The court also ordered Henry to attend Iowa Domestic Abuse Program classes. He did not begin the twenty-four week program until three weeks before the termination hearing.

In a December 2017 dispositional order, the juvenile court ordered Henry to complete a mental health evaluation and follow through with all the recommendations; comply with the no-contact orders; submit to drug testing; participate in Family Safety, Risk, and Permanency (FSRP) services; and attend visitation with D.S. Henry obtained a mental-health evaluation and received a recommendation for outpatient therapy to manage his anger. Henry attended some counseling but stopped after a few months; he obtained a second evaluation just a few days before the termination hearing, leaving a gap of several months.

In March 2018, Henry appeared to be making progress, so DHS allowed him semi-supervised visitations with D.S. When the DHS worker confronted him with reports alleging he was contacting Cassandra in violation of the court order, Henry denied the allegations. But several days later, police stopped his car and found Cassandra in the passenger seat, so they arrested Henry for violating the no-contact order and driving while suspended. Three days later, police again arrested Henry for violating the no-contact order. Cassandra called police when Henry came to her mother's house, where she was living, and acted aggressively. When police arrived, Henry fled out a window carrying Cassandra's medications with him.

In July 2018, Cassandra reported Henry came to the house again and entered without permission, demanding she return some property of his and

refusing to leave. He then threatened Cassandra's mother. Cassandra also believed Henry had been "stalking" her. Police arrested Henry for a third violation of the no-contact order. Although he largely denied the violations, the criminal court sentenced Henry to serve thirty hours in jail for the first two violations. The DHS returned Henry to supervised visitation due to his dishonesty and criminal behavior. At the termination hearing, the third violation was pending resolution.

At the termination hearing, the DHS worker testified Henry had not consistently attended his mental-health therapy and was slow to start his court-ordered domestic violence classes. The worker credited Henry as normally "very affectionate and loving toward [D.S.]" But she criticized hostile interactions he had with DHS workers and FSRP providers. Just one month before the termination hearing, Henry displayed aggressive behavior when the workers tried to give him parenting feedback. He called the social workers "glorified fucking kidnappers." At a family team meeting, Henry angrily blamed Cassandra for D.S.'s removal. The DHS worker described Henry as manipulative and controlling. She also recounted how Henry repeatedly declined to sign needed releases to coordinate services for D.S.

The FSRP worker testified D.S. and Henry have a strong bond and Henry was an attentive caregiver during their interactions. But she testified Henry's violation of the no-contact order with Cassandra went beyond the three charged incidents—Henry texted Cassandra and used other forms of communication to contact her.

The juvenile court terminated Henry's parental rights under Iowa Code section 232.116(1)(h) (2018). The court found neither parent had addressed the safety issues leading to the CINA adjudication.[2]

On appeal, Henry does not contest the statutory ground for terminating his parental rights.[3] He focuses solely on the best-interests determination.

> In considering whether to terminate the rights of a parent . . . , the court shall give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child.

Iowa Code § 232.116(2).

Henry insists he substantially complied with the court's orders, attended visitation, and worked on his relationship with his son as much as was practicable in a supervised setting. He touts his situation as more favorable than Cassandra's persistent substance abuse, cancelled visitations, and failure to properly care for D.S. during their interactions. We do not find the comparison between the father and the mother to be helpful; we evaluate independently Henry's ability to keep D.S. safe and to provide for his nurturing and growth.

Henry recognizes the State's primary concern is the impact of his anger and controlling behavior on his ability to parent D.S. He acknowledges a breakdown in his relationship with Cassandra but urges he has not directed his anger toward

---

[2] The court terminated Cassandra's parental rights under Iowa Code section 232.116(1)(h), (k), and (*l*); she does not participate in this appeal.

[3] Terminations follow a three-step analysis. *In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010). First, the juvenile court must decide if the State proved one of the enumerated grounds in section 232.116(1). *Id.* Second, the court must consider if termination is in the best interests of the children by applying the factors in section 232.116(2). *Id.* Third, if the factors require termination, the court must see if any circumstances in section 232.116(3) compel it to forego termination. *Id.* Where the parent does not dispute the existence of the grounds under section 232.116(1), we need not discuss that step. *Id.*

D.S. We are not convinced Henry's domestic violence can be so easily cleaved from his parenting promise. As the State aptly argues in its response to the petition on appeal: "the father's violent tendencies can negatively and dangerously affect the wellbeing and safety of the child." Iowa courts have long held "violent tendencies of a parent adversely impact on the fitness of that parent to be the primary caretaker of a child." *In re Marriage of Brainard*, 523 N.W.2d 611, 615 (Iowa Ct. App. 1994) (embracing expert testimony "detailing the tragic and long-term consequences of spousal abuse on children who witness the violence").

D.S. had been in Henry's care for just one month when his violent attack on Cassandra led to D.S.'s removal. During the CINA case, Henry has been unable to control his anger toward Cassandra and the social workers. Henry's lackluster participation in mental-health therapy and domestic-violence classes reveals a dearth of genuine commitment to resolving his anger issues. Most concerning, he has not complied with court orders to stay away from Cassandra. And he lied to DHS and the court about those prohibited contacts. The juvenile court found Henry's "progress has been extremely limited," and we agree.

Once the State has proved by clear and convincing evidence grounds exist for termination under section 232.116(1), we are reluctant to delay permanency based on blind optimism a parent will someday turn their life around and provide a stable home for the child. *In re A.B.*, 815 N.W.2d 764, 777 (Iowa 2012). The record shows Henry engaged in violence and persistently defied a court order to the detriment of his son. We find D.S.'s needs for safety and long-term nurturing

and growth are best safeguarded by terminating Henry's parental rights and seeking permanent placement.

**AFFIRMED.**