# IN THE COURT OF APPEALS OF IOWA

No. 19-1874
Filed June 3, 2020

**IN THE INTEREST OF C.W., I.W., K.W., and M.W.,**
**Minor Children,**

**M.W., Mother,**
    Appellant.
_____

Appeal from the Iowa District Court for Polk County, Susan Cox, District Associate Judge.

The mother appeals the termination of her parental rights to four of her children. **AFFIRMED.**

Jamie F. Deremiah of Flanagan Law Group, PLLC, Des Moines, for appellant mother.

Thomas J. Miller, Attorney General, and Ellen Ramsey-Kacena, Assistant Attorney General, for appellee State.

Magdalena Reese of Juvenile Public Defender, Des Moines, attorney and guardian ad litem for minor children.

Considered by Doyle, P.J., and Mullins and Greer, JJ.

**GREER, Judge.**

The mother appeals the termination of her parental rights to four of her children, born between 2010 and 2015.[1] The court terminated the mother's rights to all four children pursuant to paragraphs (d) and (i) of Iowa Code section 232.116(1) (2019) and also terminated the mother's rights to the oldest three children pursuant to paragraph (f). The mother challenges the statutory grounds for termination, maintains the State failed to make reasonable efforts at reunification, and argues termination of her rights is not in the children's best interests.

We review termination proceedings de novo. *In re A.B.*, 815 N.W.2d 764, 773 (Iowa 2012). "When the juvenile court terminates parental rights on more than one statutory ground, we may affirm the juvenile court's order on any ground we find supported by the record." *Id.* at 774. Here, we consider whether termination was appropriate under Iowa Code section 232.116(1)(d), which allows the court to terminate parental rights when:

> (1) The court has previously adjudicated the child to be a child in need of assistance after finding the child to have been physically or sexually abused or neglected as the result of the acts or omissions of one or both parents, or the court has previously adjudicated a child who is a member of the same family to be a child in need of assistance after such a finding.
> (2) Subsequent to the child in need of assistance adjudication, the parents were offered or received services to correct the circumstance which led to the adjudication, and the circumstance continues to exist despite the offer or receipt of services.

---

[1] The parental rights of the children's fathers were also terminated. No father appeals.

The mother challenges only the second element, arguing she has corrected the circumstances that led to the children's adjudication in October 2017.

The Iowa Department of Human Services (DHS) has been involved with this family off and on since 2008, and the mother's rights to another child were terminated in 2009. DHS became involved this time after police were called to the mother's neighborhood to deal with a naked man who was attempting to break into a home. When they arrived, the police learned the man—the father of the youngest child—was under the influence of PCP and had been left in charge of caring for the mother's children, in spite of the fact the mother had a no-contact order against the man for a recent incident of domestic violence he perpetrated against her. The home itself was unsanitary, with trash, rotten food, and a bug infestation inside the home. The children were immediately removed from the mother's care, and she was charged with four counts of child endangerment.

On top of leaving the children with an inappropriate caretaker, DHS had additional concerns regarding the children's safety after they met with the children. The children reported to DHS workers that the mother smokes "weed," uses "pokies" and "shots" in her feet, and takes pills she keeps in her closet. At testing done shortly after the children's removal, one of the children tested positive for cocaine, and the mother tested positive for cocaine and opiates of hydrocodone and oxycodone. Additionally, two of the four children were observed by a doctor to have belt-mark bruises on their bodies. Those children alleged that the youngest child's father had hit them with a belt and that that their mother was aware of it but did nothing to stop it.

The mother maintains that she now has a safe and stable home in which to parent the children and claims she no longer has mental-health, substance-abuse, or relationship issues. Additionally, she argues DHS failed to make reasonable efforts at reunifying her with the children because no one from the department came to view her home after she moved in November 2018 and she was not allowed to have visits in the home after they were ended in October 2018. *See In re C.B.*, 611 N.W.2d 489, 493 (Iowa 2000) ("[T]he reasonable efforts requirement is not viewed as a strict substantive requirement of termination. Instead, the scope of the efforts by the DHS to reunify parent and child after removal impacts the burden of proving those elements of termination which require reunification efforts. The State must show reasonable efforts as a part of its ultimate proof the child cannot be safely returned to the care of a parent." (citation omitted)).

First, the record does not support the mother's claim that she has resolved the issues that led to the children's adjudication as children in need of assistance. The mother missed some drug tests that DHS requested of her and she refused to put on a sweat patch, claiming it caused a negative reaction on her skin. Still, the mother had multiple drug tests that were positive. When she tested around the time of the children's removal, she tested positive for cocaine and opiates. In the drug tests she took in September 2018 and May 2019—less than two weeks before the first day of the termination proceeding—she tested positive for opiates. At the termination hearing, the mother testified she had a prescription for opiate drugs due to ongoing issues she has with pain. The mother provided evidence of March and November 2018 prescriptions for hydrocodone, but she failed to provide any

updated documentation surrounding her positive tests to explain the presence of opiates.

Additionally, while the mother testified she is not in a relationship and has not been in a relationship during this case, her testimony is not credible. Insofar as the mother's therapist backed up the mother's statements and opined that the mother had new insights into recognizing and choosing healthy relationships, we find the therapist's testimony less than persuasive since it is clear her knowledge is based on what the mother reports and the mother was less than candid with her. The better evidence established the mother was dating—at least at one point in late 2018—a man with a criminal history involving the use and distribution of methamphetamine. And the mother introduced this man to one of the children, in violation of DHS's orders, as the child reported to the foster parents that she had a secret about meeting her new "dad." The mother claims there is no truth to this—either the relationship or that she introduced the kids to a man—but her Facebook account showed several posts about a specific man during that time and the man's business information (also available on Facebook) corroborate other comments and descriptions given by the young child. The mother claimed her account was hacked and someone else must have put up the posts about the man, but this strains credulity.

We cannot say whether the mother's new home is better maintained and more safe for the children because DHS did not visit the new home. But we understand DHS's rationale, and we do not find a failure to make reasonable efforts based on this issue. DHS's concern about the state of the mother's housing was limited to whether it was safe for the children. As the children's therapist

suggested the children should not have visits in the mother's home until the mother made more progress in other aspects of the case, a suggestion DHS agreed with, there was no reason to view the house before that time. Especially since the mother has shown she can clean up her home for a short time; the question is whether she can maintain the home long-term. Moreover, it was not DHS's failure to view the home that prevented visits from taking place there. The mother's lack of progress in other areas of the case plan plus her inability to handle the behaviors of the children prevented visits from taking place there.

Because the circumstances that led to the children's adjudication still existed at the time of the termination hearing, we agree with the juvenile court that the State proved the ground for termination of the mother's parental rights pursuant to section 232.116(1)(d). And we have the benefit of a detailed and extensive termination order listing the circumstances supporting termination.

Next, the mother maintains termination of her parental rights is not in the children's best interests. In considering the best interests of the children we "give primary consideration to the child[ren]'s safety, to the best placement for furthering the long-term nurturing and growth of the child[ren], and to the physical, mental, and emotional condition and needs of the child[ren]." Iowa Code § 232.116(2). As our case law provides, the defining elements in a child's best interests are the child's safety and need for a permanent home. *See In re J.E.,* 723 N.W.2d 793, 801 (Iowa 2006) (Cady, J., concurring specially). The need for permanency was especially manifest here, as the children seemed to fatigue of the process— sometimes refusing to go to visits out of apparent frustration with the mother's lack of progress and expressing a desire for the proceedings to be finished. The four

children have been in the same foster care placement since January 2018, and the foster parents are interested in adopting them. *See* Iowa Code § 232.116(2)(b)(1). This family can provide the stability and safety for the children that the mother is yet unable to do. Termination of her parental rights is in the children's best interests.

We affirm the termination of the mother's parental rights to these four children.

**AFFIRMED.**