# IN THE COURT OF APPEALS OF IOWA

No. 22-1052
Filed August 17, 2022

**IN THE INTEREST OF E.E. and Z.E.,**
**Minor Children,**

**T.M., Mother,**
     **Appellant.**
_____

Appeal from the Iowa District Court for Union County, Monty W. Franklin, District Associate Judge.

A mother appeals the termination of her parental rights.  **AFFIRMED.**

Adam D. Hanson of Hanson Law Office, Winterset, for appellant mother.

Thomas J. Miller, Attorney General, and Mary A. Triick, Assistant Attorney General, for appellee State.

Tamara Lea Knight, Greenfield, attorney and guardian ad litem for minor children.

Considered by Vaitheswaran, P.J., and Greer and Schumacher, JJ.

**GREER, Judge.**

T.M. is the mother of E.E. and Z.E., born in 2008 and in 2009 respectively. Due to her serious and untreated mental-health condition, the mother's parental rights were terminated in June 2022. She argues the State failed to prove the grounds for termination, termination is not in her children's best interests, and permissive exceptions should be applied to avoid termination. Because she only challenges one of the grounds for termination but not the other, termination is in her children's best interests, and evidence does not support applying any permissive exceptions to termination, we affirm the termination of her parental rights.

**Facts and Proceedings.**

The mother and the children's father were divorced and had shared physical care, with the children switching between the two homes every other week. In early October 2020, the Department of Human Services (DHS) became involved over allegations of physical abuse of Z.E. and instances of emotional abuse. A child protection worker (CPW) went to the father's home and spoke with both Z.E. and E.E., who expressed concerns about the mother's erratic behavior, including her not allowing them to leave the home, yelling at them or their friends without reason, and accusing the children of behaviors that had not occurred. Both children reported they spent most of their time at the mother's home in their rooms to avoid her and when they want to leave the mother made them stay at the home for bizarre and paranoid reasons.

Within a week of the initial intervention, the mother's seventeen-year-old daughter—who is not at issue here—reported the mother had assaulted her.

Although the older daughter lived with her father, she was at the mother's house helping her younger half-siblings with their homework and making them dinner. Following a disagreement, the mother grabbed the older daughter by the wrist and dragged her from the home, eventually shoving her to the ground and landing on top of her. E.E. and Z.E. were present and saw these events; E.E. even had a video captured on her cell phone. The older daughter returned the next morning to check on her younger siblings, and the mother assaulted her again while E.E. was present. The CPW went to visit the mother's home and described the mother's behavior as "paranoid and bizarre," "emotionally unstable," and "agitated and detached from reality." The mother allowed the CPW to speak with E.E., but she eventually grabbed the child by the arm and demanded that the CPW leave.

Later that day, as a part of a safety plan, both E.E. and Z.E. were removed from the mother's home and placed with their father. Ultimately, there was a founded allegation of denial of critical care based on the assault of the older child in front of the younger two and the mother's mental-health concerns, which were described as "significantly interfering with [the mother's] ability to provide proper supervision to her children."[1] E.E. and Z.E. were adjudicated children in need of assistance (CINA) in January 2021. In the CINA dispositional order, the mother was ordered to complete a mental-health evaluation, comply with its recommendations, and participate in family centered services.

The mother had a psychological evaluation done by Dr. Bruce Dawson. He diagnosed her with post-traumatic stress disorder (PTSD); adjustment disorder

---

[1] There was also a founded allegation of physical abuse against the older daughter, who is not involved in this case.

with anxiety; and mild neurocognitive disorder, provisional. But in May, the mother began seeing Joshua Krueger, a clinical therapist who did an initial assessment and provided her therapy. He diagnosed her with histrionic personality disorder and PTSD. At the termination hearing, he explained histrionic personality disorder to the juvenile court as:

> [A] personality disorder characterized by a pattern of excessive attention-seeking behaviors usually beginning in early childhood including inappropriate seduction and excessive desire for approval.
> So approval comes from relationships. Essentially the social relationships that they gain, they desire approval. They continue to seek approval most—in situations where it becomes a disorder in an unhealthy fashion.
> I believe that essentially the identity that [the mother] has is as a mother and that—that identity justifies her behavior as long as— essentially for whatever it is. That makes it unrecognizable as inappropriate because that would challenge the identity as a mother.

He also testified the mother would "select a different reality" consistent with her identity as a good mother. As for the mother's progress, Dawson stated this condition would not self-resolve; it required individual therapy as well as medication because psychotic symptoms, depression, and anxiety can present without help.

The mother's participation in counseling was sporadic—starting in May, she saw Krueger five times before discontinuing treatment in December. But, while the mother was attending, Krueger had an opportunity to have family therapy sessions with her and the two children, as well as meeting with the children alone. After these experiences, Krueger believed they were afraid of the mother because "[t]hey attempted to avoid stimulating her. They would choose to sit across the room, if possible, and avoid eye contact, also physical contact." Ultimately, he

reported that "given the severe nature of [the mother's] cognitive distortions, as it specifically relates to her parental function, I cannot recommend that [the mother] be authorized to have decision-making rights over her children." He testified the condition inhibited her ability to parent because she was punishing the children based on the reality[2] she self-selected rather than one they could understand; this, he said, was a traumatizing experience for the children. Even after showing the mother a video of her out-of-control behavior on the phone with her older child, the mother could not address the impact or reality of her actions.[3]

The mother also had a psychiatric evaluation done by Kennedy Thoren in October of 2020. Thoren diagnosed the mother with personality disorder and bipolar disorder type II, but said any medication recommendation would require further assessment; Thoren encouraged psychotherapy.

After discontinuing treatment with Krueger, the mother began seeing Jill Jackson, a therapist she had seen on and off for the last eighteen years.[4] Jackson provided DHS a report that the mother:

> had very good attendance with therapy, and has been very motivated to follow through with all treatment recommendations. She is very motivated to regain custody of her children, and seems to be trying to follow through with all the requirements and recommendations of

---

[2] One such example was discussed at the termination hearing. The mother maintains that, when the children had friends over one day in 2016 or 2017, Z.E. had his eyelashes cut and E.E.'s eyebrow was shaved or cut and she was elbowed in the jaw. Neither of the children nor their father recall this ever happening; the mother asserted the children's father just was not speaking up and the children had repressed the memory because "[w]ho would want to remember that?"

[3] The CPW described the video of the phone call as "alarming."

[4] Krueger was aware that these other evaluations had been completed, but testified at the termination hearing that he felt he had a fuller perspective than other providers because he had seen the mother with the children. He also noted that the mother was able to present calmly for short periods of time when no one was questioning her version of reality.

DHS. I feel she is emotionally stable and capable of providing appropriate parental supervision.

The mother testified Jackson had diagnosed her with only mild depression.

Because of DHS's concerns about the mother's mental health, she was allowed supervised visitation. In October 2020, the mother was initially set to receive family centered services and one supervised visit a month from Children and Families of Iowa. After she consistently refused to meet with the provider, DHS discontinued the service and implemented Mid-Iowa Family Therapy instead in March of 2021. That July, the mother discontinued that service as well because she thought the worker was interrupting her parenting time. So, her case manager began managing the mother's supervised visits instead. But the mother stopped allowing the case manager in her home and directed the case manager to only contact her through legal counsel because the case manager was too negative and repeatedly told her the children were afraid of her, which hurt her feelings. The case manager reported that when she would tell the mother her concerns or challenge her in any way, the mother would yell or start on an "angry diatribe." By March of 2022, a month before the April 8 termination hearing, the mother maintained that DHS had suspended the services, not her; she asked for the service to be restarted. Though providers all agreed this had not been the case; still, they restarted the service and successfully completed two sessions that month.

Ahead of the termination hearing, E.E. and Z.E. were asked repeatedly how they felt about living with their mother and even wrote letters to the juvenile court. Both expressed feeling like they had to walk on eggshells around their mother;

they consistently stated they are afraid of the mother and wanted her parental rights terminated. Since being placed with their father full time, they are spending time with friends, participating in after-school activities, and doing better academically and emotionally—they are reported to be thriving in his care.

When presented with questions about her diagnoses at the termination hearing, the mother denied any mental-health diagnosis other than mild depression caused by DHS's interference in her family. She explained that, after seeing the report from Thoren, she called the office and was told she had a clean bill of mental health—the diagnoses were merely listed for insurance purposes. Krueger, she said, was too negative; she seemed to ignore his diagnosis. Yet, at the hearing, when pressed about the other evaluations, Krueger opined that the mother had "mastered sort of an acceptable personality" that would make people "not look too deeply or not put her in a situation that she would be able to express herself." And the mother even admitted that, when DHS had previously been involved with her family around 2008, she was sent to a class for people with what she described as "intense emotional disorder" or "personality disorder"; but she did not relate with the people there because she had "no issues with living right and doing the right thing and being a good person taking care of myself and my family." She also denied ever assaulting her older daughter.

Altogether, by the time of the termination hearing, the children had been removed from the mother's care for over eighteen months. The district court terminated the mother's parental rights under Iowa Code section 232.116(1)(d) and (f) (2022). The mother timely appealed.

**Analysis.**

The mother (1) challenges one of the grounds for termination, (2) argues termination is not in her children's best interests, and (3) believes the juvenile court should have used one of the permissive exceptions found in section 232.116(3)(c) to avoid terminating her parental rights. We review a termination of parental rights de novo. *In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010).

**Grounds for Termination.**

Pointing only to one of the grounds for termination, the mother asserts the State did not prove termination under section 232.116(1)(f). But she does not challenge termination under 232.116(1)(d), which requires the juvenile court to find both:

> (1) The court has previously adjudicated the child to be a [CINA] after finding the child to have been physically or sexually abused or neglected as the result of the acts or omissions of one or both parents, or the court has previously adjudicated a child who is a member of the same family to be a [CINA] after such a finding.
> (2) Subsequent to the [CINA] adjudication, the parents were offered or received services to correct the circumstance which led to the adjudication, and the circumstance continues to exist despite the offer or receipt of services.

When parental rights are terminated under multiple grounds, "we need only find termination appropriate under one of these sections to affirm." *In re J.B.L.*, 844 N.W.2d 703, 704 (Iowa 2014). As such, we affirm that a ground for termination has been met under section 232.116(1)(d).

**Best Interests.**

Next, the mother asserts termination is not in the children's best interests.[5] When contemplating best interests, we "give primary consideration to the child[ren]'s safety, to the best placement for furthering the long-term nurturing and growth of the child[ren], and to the physical, mental, and emotional condition and needs of the child[ren]." Iowa Code § 232.116(2). This can include "[w]hether the parent's ability to provide the needs of the child is affected by the parent's mental capacity or mental condition." *Id.* § 232.116(2)(a).

The mother here has significant, longstanding, and untreated mental-health conditions that prevent her from properly caring for her children. *See In re A.W.*, No. 18-0094, 2018 WL 1182618, at *1 (Iowa Ct. App. Mar. 7, 2018) (collecting cases where untreated mental-health conditions warranted termination). This problem will only worsen as the children get older and continue to challenge her understanding of reality. All evidence pointed to a serious, ongoing mental-health condition that interfered with the emotional health of the children and with their

---

[5] The mother makes a passing reference that a bridge order placing the children in the father's physical care while maintaining her parental rights offered a less-restrictive option. *See* Iowa Code § 232.103A(1) (outlining the criteria for a bridge order, which closes the CINA action and transfers "jurisdiction over the child's custody, physical care, and visitation to the district court"). This argument faces two hurdles. First, it is unpreserved—the mother never sought a bridge order. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal."). And second, even looking to the merits, a bridge order would not ensure the children's safety because the mother's mental-health concerns are still unaddressed and she is adamant she has not done anything wrong. *See* Iowa Code § 232.103A(1)(e); *In re L.M.*, No. 19-0426, 2019 WL 2373649, at *1 n.2 (Iowa Ct. App. June 5, 2019) ("We find continued concerns for the children's safety precluded the use of a bridge order in this case."). In this case, a bridge order would not be appropriate.

safety under the mother's care. Yet, the mother continually denied any problems and made no efforts to change. As the juvenile court stated, "[T]hese children have told, even implored, everyone they can that they want and need [the mother's] parental rights to be terminated in order to maintain both their physical and emotional health." They require stability and permanency that their mother will not create for them. *See In re A.H.*, No. 20-1660, 2021 WL 1399743, at *2 (Iowa Ct. App. Apr. 14, 2021) ("We conclude the mother has been given ample time to get her affairs in order and this child's best interests are best served by providing permanency and stability now."). And as the CPW noted, "I do not believe that the children can be emotionally safe with [the mother] and that they are always in a heightened state waiting for something bad to happen." We agree with the juvenile court that termination of the mother's rights is in the children's best interests.

**Permissive Exceptions.**

Finally, the mother argues the juvenile court should have utilized the permissive exceptions to termination found in section 232.116(3) rather than terminating her rights because "[a] relative has legal custody of the child," or "[t]here is clear and convincing evidence that the termination would be detrimental to the child at the time due to the closeness of the parent-child relationship." Iowa Code § 232.116(3)(a), (c). The burden to prove these permissive exceptions rests on the parent wishing to benefit from them. *In re A.S.*, 906 N.W.2d 467, 476 (Iowa 2018). The State argues we should not consider this claim because it was not preserved. *See Meier*, 641 N.W.2d at 537; *see also In re A.B.*, 815 N.W.2d 764, 773 (Iowa 2012) (applying rules of error preservation to termination actions). The

State is correct that the mother never raised these exceptions to the juvenile court. Even so, the evidence here would not support applying a permissive exception.

**Conclusion.**

Because the mother did not challenge all of the grounds for termination, termination is in the children's best interests, and the evidence does not support applying any permissive exceptions to termination, we affirm the juvenile court's termination of her parental rights.

**AFFIRMED.**