# IN THE COURT OF APPEALS OF IOWA

No. 22-1034
Filed September 21, 2022

**IN THE INTEREST OF A.C.,**
**Minor Child,**

**J.C., Father,**
     Appellant.
_____

     Appeal from the Iowa District Court for Polk County, Brent Pattison, District

Associate Judge.


     A father appeals the termination of his parental rights to his five-year-old

daughter.  **AFFIRMED.**


     Alexandra M. Nelissen of Advocate Law, PLCC, Clive, for appellant father.

     Thomas J. Miller, Attorney General, and Ellen Ramsey-Kacena, Assistant

Attorney General, for appellee State.

     Todd E. Babich of Babich Goldman, P.C., Des Moines, for appellee mother.

     Richelle Mahaffey, Des Moines, attorney and guardian ad litem for minor

child.


     Considered by Bower, C.J., and Tabor and Chicchelly, JJ.

**TABOR, Judge.**

A father, Joshua, appeals an order terminating his parental rights.[1] The termination followed a founded report that he sexually abused his five-year-old daughter, A.C. Joshua contends that the State failed to prove a statutory ground, it is not in A.C.'s best interests to terminate his rights, and the juvenile court should have relied on permissive factors to avoid termination.

After our independent review, we reach the same determination as the juvenile court.[2] Because Joshua did not embrace services to address the circumstances leading to A.C.'s trauma, the State proved a statutory ground. Beyond that, it serves A.C.'s best interests to terminate her legal relationship with Joshua. And no permissive factor prevents termination. So we affirm.

## I. Facts and Prior Proceedings

A.C. came to the court's attention in August 2020 when she made disturbing comments that prompted her mother, Carla, to suspect sexual abuse by Joshua. For example, A.C. revealed that she did yoga naked with Joshua, demonstrating with a thrusting motion of her hips. The girl also disclosed that Joshua said she needed "sparkle cream" inside her vagina so it would not be "ugly." Carla brought her suspicions to A.C.'s pediatrician, who informed child protective workers and law enforcement.

---

[1] The mother responded to the petition on appeal; the State filed a statement "substantially agreeing" with the mother's response.

[2] We review termination proceedings de novo. *In re L.B.*, 970 N.W.2d 311, 313 (Iowa 2022). We respect the juvenile court's factual findings but are not required to adopt them. *Id.* The State must prove the grounds for termination by clear and convincing evidence. *Id.*

In the wake of those allegations, Joshua moved out of the home where he was living with Carla, A.C., and Carla's two older children. Because A.C. remained in Carla's custody, there was no removal order. The juvenile court directed visitation with Joshua to be at the discretion of the Iowa Department of Health and Human Services (DHHS).

But the DHHS did not offer visitation after a child protective assessment, including A.C.'s forensic interview at the STAR Child Protective Center, confirmed the allegations of sexual abuse. On top of her earlier disclosures, A.C. told the interviewer that Joshua inserted a gloved hand with lotion, "food and drinks," and toys in her buttocks. She added, "I don't like toys in my butt." A.C. also told Carla that Joshua's beard hair would "get in there" and "he put it in there," pointing to her genital area. Carla recalled sometimes finding Joshua lying in bed or showering with A.C. And, according to Carla, A.C. had frequent yeast infections that stopped after Joshua moved out of the house.

From the start, Joshua denied A.C.'s allegations and continued to deny them throughout these proceedings. He first brought up Carla's father being around A.C., asserting that the grandfather did yoga. While Joshua admitted showering with A.C., he denied performing any sex acts.

But the forensic interviewer found A.C.'s reports credible—including her identification of Joshua, not her grandfather, as the perpetrator. In December 2020, the DHHS found that Joshua committed lascivious acts with a child. Four months later, the juvenile court adjudicated A.C. as a child in need of assistance (CINA) based on those findings. *See* Iowa Code § 232.2(6)(c)(2) (2021) (defining a CINA as one who has suffered or is imminently likely to suffer from failure of a

parent to exercise a reasonable degree of care in supervision), (d) (child has been or is imminently likely to be sexually abused), (n) (parent's condition results in the child not receiving adequate care). The court relied on the child abuse assessment and evidence from A.C.'s therapist that she exhibited behaviors typical for a child who has experienced sexual abuse including "imitating sex acts and inserting items into her vaginal area." Joshua took no position on the adjudication and did not appeal its findings.

After separating Joshua from A.C., the DHHS recommended that Joshua participate in Family Centered Services (FCS), undergo a psychosexual evaluation, and obtain mental-health therapy to address his acts of sexual abuse. And Joshua did start seeing therapist Amy Lapham in the fall of 2020. But he continued to deny committing sexual abuse. Although Joshua asked to see A.C., the DHHS did not recommend visitation because, given his denials, A.C.'s therapist warned against any contact.[3] Beyond seeking visitation, Joshua's cooperation with the DHHS and engagement in services was sparse. He did not complete a requested social history form. And he never participated in FCS.[4] During the summer and fall of 2021, Joshua resisted requests for a psychosexual evaluation. So the State petitioned to terminate Joshua's parental rights.

By the time of the termination hearing in February 2022, Joshua had not seen A.C. for eighteen months. Caseworker Wednesday Westerhold testified that

---

[3] A.C. is engaged in therapy and has a diagnosis of post-traumatic stress disorder. The DHHS reports that Carla made it a point to address the sexual abuse and does not allow contact with Joshua. She has been engaged with recommended services and is working with A.C. to address her trauma and related behavioral challenges.
[4] Joshua wanted his attorney to be present during services.

it had been difficult to obtain releases from Joshua for his therapy records. Without that access, the DHHS had "no way of knowing" whether Joshua was addressing the sexual abuse in therapy or if the risk was being mitigated. Westerhold identified Joshua's sexual abuse of A.C. and refusal to accept responsibility as the main obstacles to visitation.

Therapist Lapham testified that she had been treating Joshua for over a year, and he continued to deny allegations that he sexually abused his daughter. Lapham testified that sex offender treatment would be ineffective for someone who does not admit to the conduct. So she only offered therapeutic support. Their work focused on Joshua's "sadness and anxiety over not being able to see his daughter." Lapham did discuss the needs of children who experienced trauma. Lapham explained that Joshua was "open to the possibility that [A.C.] may have been harmed by another person." Lapham declined to make a recommendation on reunification with A.C.—she stated, "I'll leave that to the child's therapist."[5]

Joshua also testified. He denied perpetrating the sexual abuse and said he does not need sex offender treatment. When asked whether he believed A.C. has been sexually abused, he responded, "I'm not sure." He blamed Carla for the accusations and for A.C.'s trauma-related behaviors.

On the last day of the hearing, Joshua presented a psychosexual evaluation by Dr. Matthew Cooper. The evaluation concluded that Joshua's risk to reoffend was "below average." Dr. Cooper recommended that Joshua comply with DHHS

---

[5] Together, Joshua and Lapham developed a "family safety plan" or "monitoring agreement" for when supervised contact could resume. And she helped Joshua write an "accountability letter" to A.C. The letter does not say at any point that Joshua accepts responsibility for the sexual abuse.

directives and that a reunification plan allowing supervised contact with his daughter be pursued when the juvenile court, the DHHS, and the daughter's therapist agreed.[6] In a letter submitted after the hearing, therapist Lapham again refused to comment on A.C.'s best interests, saying "this should be left to the professionals she is involved with." But Lapham suggested "moving forward . . . aided by a reunification therapist" who could review the case and advise all parties.

A.C.'s therapist was not moved by the psychosexual evaluation, explaining:

> [T]he lack of accountability for the sexual abuse directly invalidates [A.C.'s] experiences, thoughts, and emotions related to her trauma. If presented with the perpetrator, individuals who have experienced abuse could become triggered and retraumatized. If contact with Joshua were to begin, [A.C.] could experience disruption in her ability to continue processing her experienced trauma and an increased difficulty in regulating her emotions and behaviors.
> It is important that [A.C.] has the opportunity to continue processing her experienced trauma in a safe way.

Relying on the DHHS abuse findings, Joshua's denials, and the concerns of A.C.'s therapist, the juvenile court found the clear and convincing evidence supported termination under Iowa Code section 232.116(1), paragraphs (d) and (i). Joshua appeals.

## II. Analysis

We analyze orders to terminate parental rights in three steps. *In re L.B.*, 970 N.W.2d 311, 313 (Iowa 2022). First, we consider whether the State proved statutory grounds for termination. Iowa Code § 232.116(1). Second, we decide

---

[6] Because this evidence was obtained and offered so late in the case, the court left the record open for additional written comments on the evaluation by Joshua and A.C.'s therapists and for closing briefs.

whether termination is in the child's best interests. *Id.* § 232.116(2). Third, we consider whether the parent has shown that any permissive factors apply. *Id.* § 232.116(3); *see In re A.S.*, 906 N.W.2d 467, 476 (Iowa 2018) (explaining "once the State has proven a ground for termination, the parent resisting termination bears the burden to establish an exception to termination").

## A. Statutory ground for termination

Joshua first contends the State failed to show sufficient evidence of the statutory grounds for termination. The juvenile court terminated his parental rights under paragraphs (d) and (i) of section 232.116(1). While Joshua challenges the proof of both grounds on appeal, we may affirm on either if supported by the record. *In re W.M.*, 957 N.W.2d 305, 313 (Iowa 2021). We focus on paragraph (d), which requires proof of these elements:

> (1) The court has previously adjudicated the child to be a [CINA] after finding the child to have been physically or sexually abused or neglected as the result of the acts or omissions of one or both parents, or the court has previously adjudicated a child who is a member of the same family to be a child in need of assistance after such a finding.
> (2) Subsequent to the [CINA] adjudication, the parents were offered or received services to correct the circumstance which led to the adjudication, and the circumstance continues to exist despite the offer or receipt of services.

Iowa Code § 232.116(1)(d). Joshua concedes the first factor and contests the proof of the second.

As noted, the district court decided that A.C. met the definition of a CINA based on an imminent likelihood of sexual abuse, as well as the parent's failure to supervise and because the child had not received adequate care. *See id.* § 232.2(6)(d); *see also id.* § 232.2(6)(c)(2), (n). Joshua contends the State failed

to prove those circumstances continue to exist despite services. He points to the psychosexual evaluation classifying him as below average risk to reoffend and Dr. Cooper's recommendation for reunification therapy. Plus, therapist Lapham reported he was meaningfully engaged in treatment and recommended steps toward reunification. In his view, those services corrected the conditions that led to the abuse. He faults the juvenile court for failing to give sufficient weight to that information. And he urges us to "rely on the expertise of professionals" to find he is ready to be reunited with A.C.

Trouble is, Joshua ignores the advice of A.C.'s mental-health professional. Her therapist cautions against reintroducing A.C. to her father until he has acknowledged culpability for sexually abusing her. In her professional opinion, Joshua not only caused her trauma, his denials invalidate A.C.'s experience and can continue to harm her and impede her therapeutic progress.

In her response to the petition on appeal, the mother identifies two safety considerations: 1) the risk that Joshua will sexually abuse A.C. again; and 2) the risk of continued psychological and emotional harm to A.C. from his refusal to take responsibility. Joshua focuses on the first issue—overlooking the second risk. And he misrepresents the conclusions of his mental-health professionals.

After the adjudication order identified both concerns, Joshua spent the next ten months denying the abuse. His therapy addressed the effect of the CINA case on *him* and how to cope with *his* stress and anxiety. Lapham acknowledged that their work was neither sex offender treatment nor aimed at recognizing and remediating the factors that led Joshua to sexually abuse his daughter. And although Dr. Cooper concluded that Joshua posed a below average risk of

reoffending, he cautioned, "The accuracy of the report is partially contingent on [Joshua's] reliability as a historian and informant." In addition, Dr. Cooper's recommendation for reunification contained the caveat "if . . . his daughter's therapist [is] in agreement." Lapham's tepid proposal for reunification therapy also yielded to A.C.'s therapist, who believed that any contact would be harmful.

Joshua laments that denying allegations of sexual abuse "sets forth a situation which seems impossible for a parent to overcome regardless of their cooperation with services." True, the situation "presents the awesome challenge of getting treatment for a deficit the parent claims he does not have." *In re C.H.*, 652 N.W.2d 144, 147 (Iowa 2002). Still, Joshua did not appeal the adjudication findings.[7] *See In re M.W.*, 876 N.W.2d 212, 222 (Iowa 2016) ("[The father] did not timely appeal the order adjudicating the children as CINA, and thus the juvenile court's adjudication order is conclusive."). He has not engaged in therapy to prevent future sexual abuse. He has not accepted responsibility and testified he doesn't know if A.C. was sexually abused at all. The record shows he was offered appropriate services but did not embrace them to correct the circumstances. So the nagging risks present at adjudication continue to exist. Thus, the evidence supports termination under paragraph (d).

### B. Best interests

Next, Joshua argues termination of parental rights is not in A.C.'s best interests under Iowa Code section 232.116(2). Under that section, we "give primary consideration to the child's safety, to the best placement for furthering the

---

[7] Our record does not disclose any criminal proceedings or conviction resulted from this investigation.

long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2).

Joshua argues A.C. "will not have the ability to establish important and vital connections with [her] parent and other biological relatives on the father's side." He claims that her behavioral difficulties stem from the loss of their connection. He also believes that his participation would help A.C. progress in therapy. Finally, he argues that if he resumes contact with A.C., Carla will safeguard their daughter's well-being because she believes the abuse took place.[8]

We are unconvinced by his arguments. Joshua did not complete a psychosexual evaluation until the eleventh hour. His therapy was aimed at his own anxieties rather than protecting A.C. from further harm. A.C.'s therapist credibly concluded that any contact with Joshua would be harmful so long as he denies sexually abusing her, a position he is unlikely to change. Because of this position, he has not seen his daughter since August 2020. Nothing in the record shows Joshua can provide a safe home for A.C. or further her nurturing and growth. Like the juvenile court, we find termination is in A.C.'s best interests.

## C. Permissive factors

Finally, Joshua argues that severing their relationship would be "detrimental to the child . . . due to the closeness of the parent-child relationship." *See* Iowa Code § 232.116(3)(c). He did not raise this issue in the juvenile court and the

---

[8] Testimony at the joint termination-permanency hearing included details about Carla's work and mental-health struggles and Joshua's allegedly controlling and violent conduct toward her. Carla also testified about her two other children, A.C.'s half-brothers. Because much of this evidence was admitted subject to objections and none of it is necessary to reach our conclusions, we avoid an extensive discussion of that information.

termination order did not address it, so he waives it on appeal. *See In re A.B.*, 815 N.W.2d 764, 773 (Iowa 2012).

Joshua also argues termination is unnecessary because A.C. is in Carla's custody. *See* Iowa Code § 232.116(1)(3)(a) (stating a court can choose not to terminate if child is in legal custody of a relative). The juvenile court addressed this factor, though Joshua did not raise it at the termination hearing. We agree with the juvenile court that given the dysfunctional relationship between the parents, custody with the mother is not a reason to preserve Joshua's parental rights.

**AFFIRMED.**