**IN THE COURT OF APPEALS OF IOWA**

No. 24-1187
Filed November 13, 2024

**IN THE INTEREST OF P.C.,**
**Minor Child,**

**A.C., Mother,**
    Appellant.
_____

Appeal from the Iowa District Court for Fayette County, Linnea M.N. Nicol, Judge.

A mother appeals the termination of her parental rights to her one-year-old son. **AFFIRMED.**

Kimberly S. Lange of Juvenile Public Defender's Office, Waterloo, for appellant mother.

Brenna Bird, Attorney General, and Lisa Jeanes, Assistant Attorney General, for appellee State.

Kristin R. Schiller Herman, Calmar, attorney and guardian ad litem for minor child.

Considered by Tabor, C.J., and Ahlers and Sandy, JJ.

**TABOR, Chief Judge.**

Addressing her recovery from methamphetamine addiction, a mother testified: "I just wish it would have been sooner because it could be the loss of my son. But I take full responsibility for how long it's taken. . . . So at the end of the day, I guess it might have been a little bit too late . . . ." She was right. The juvenile court terminated her parental rights to her one-year-old son, P.C., finding that he "had no ability to protect himself when his mother is triggered by her traumatic past and uses drugs."

The mother appeals the termination, urging four reasons for reversal. One, she contends the State did not offer clear and convincing proof under Iowa Code section 232.116(1)(h) or (*l*) (2024). Two, she argues that termination was not in P.C.'s best interests. Three, she maintains that the State did not make reasonable efforts to reunify her family. And four, she asks to delay permanency for six months so that she can continue to work on her sobriety as she awaits the birth of another child. After reviewing these four claims, we find no basis for relief. Instead, clear and convincing evidence shows that the grip of the mother's methamphetamine addiction prevents safe parenting.

## I. Facts and Prior Proceedings

The mother's involvement with the child-welfare system predated P.C.'s birth. In February 2021, the juvenile court terminated her parental rights to twelve-year-old N.C. and eight-year-old C.C. The juvenile court explained that despite her efforts at in-patient substance-use treatment, the mother did not maintain sobriety. Our court affirmed those termination orders. *In re N.C.*, No. 21-0245,

2021 WL 2134994, at *3 (Iowa Ct. App. May 26, 2021) ("She admitted to using drugs throughout the case, including just days before the termination hearing.").

Two years later, the mother gave birth to P.C. Both mother and child tested positive for methamphetamines in the hospital. When he was three days old, the Iowa Department of Health and Human Services removed P.C. from the mother's custody and placed him in foster care. The court adjudicated him as a child in need of assistance (CINA) in July 2023.[1]

The next few months were tough for the mother. Every drug test between May and October 2023 came back positive for methamphetamine. Despite her methamphetamine use, the department facilitated visits between the mother and P.C.—moving from twice to four or five times per week.

That visitation schedule changed in October when the mother entered in-patient treatment at the House of Mercy in Des Moines. At first, she had one fully supervised visit per week. Soon, she transitioned to some overnight visits and then an extended week-long visit over the Thanksgiving holiday. If that visit went well, the department intended to place P.C. with his mother while she completed the program. But it did not go well. After a fight with another resident, the mother

---

[1] Because the mother and P.C. were at high risk, the social worker testified that the case was determined to be appropriate for "infusion court." She described the difference between infusion court and other juvenile court hearings:

> Our goal is to serve families with a higher intensity of services. Typically there's a substance use component present in these cases that has been long term and ongoing as well as prior terminations, mental health, so really the more complex cases we see. . . . So we have infusion staffings held prior to every court hearing, usually about a week before, and then these court hearings occur approximately every three to four weeks which really gives the family and the team as a whole a chance to convene and discuss issues much quicker.

left the House of Mercy—against medical advice—the Monday after Thanksgiving with P.C. in tow. House of Mercy staff immediately called Des Moines police to report the incident. A few hours later, the department learned that the mother and P.C. were at a friend's residence in Mason City. P.C. was placed back with his foster family. Despite scheduling efforts by the department, the mother had no visits with him until after Christmas 2023.

Then shortly after the first of the year, the mother suffered a grim trauma. She went to visit a friend and found her hanging in her apartment. The shock caused the mother to relapse on methamphetamine. At that point, the mother knew that she was expecting another child. Being pregnant and traumatized by her friend's suicide, she decided that she "just didn't want to self-medicate anymore." About ten days later, she entered the YWCA in-patient treatment program in Fort Dodge. She testified that she felt more supported at the YWCA program and started to learn coping skills.

Court hearings in the CINA case had always been triggering events for her. So when the State petitioned to terminate her parental rights in February 2024, she thought about leaving in-patient treatment. But she mustered the courage to stay. She testified:

> [W]hat helped me stay was at the very end of that [review] hearing was when Your Honor said, . . . you are making great progress and she told me she was proud of me and that she seen a change in me and that it would be her final decision. So that's why I stayed because if she can see progress in me, then obviously I'm doing what I need to do.

In April, her obstetrician recommended that she transition to outpatient treatment because she was experiencing pain associated with her pregnancy. At

the time of the termination hearing in May, the mother was staying at an after-care apartment approved by the YWCA program. The mother met her roommate in treatment.

At the hearing, the social work case manager recommended termination, noting that the mother had only ten confirmed days of sobriety: "Due to her history of substance use, there hasn't been enough time of stability to ensure [P.C.'s] safety in her care." As her witness, the mother called Lisa Faust, the family support specialist with Mid-Iowa Family Therapy Clinics. Faust testified that she was conflicted about whether the mother should have six more months to reunify. On the one hand, Faust believed that the mother was "doing the things that she needs to do right now. She's building that foundation to be a stable parent." On the other hand, she believed that P.C. needed the permanency and stability he was receiving with his foster parents. The mother also testified that she could give P.C. the support he needed, but "just need[ed] a little bit more time just to show you that I can stay sober this time."

The juvenile court granted the State's petition to terminate the mother's parental rights under Iowa Code sections 232.116(1)(h) and (l).[2] The court found that termination was in P.C.'s best interests and that no statutory exception applied. Iowa Code § 232.116(2), (3). The court also found that the State met its obligation to make reasonable efforts to support reunification. And it denied a six-month delay in permanency. The mother appeals.[3]

---

[2] The court also terminated the parental rights of any putative fathers. The mother is the only parent to appeal.

[3] "We review termination proceedings de novo, examining both the facts and law and adjudicating anew those issues properly preserved and presented." *In re A.R.*,

## II.    Discussion

In termination cases, we follow a three-step analysis.  *In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010).  First, we must decide whether the State proved a ground for termination from Iowa Code section 232.116(1) by clear and convincing evidence.  *Id.*  Second, we consider whether termination was in the child's best interests under the framework of section 232.116(2).  *Id.*  Third, if the State meets those two prongs, we consider the permissive exceptions in section 232.116(3).  *Id.* at 41.  We only discuss those steps the parent argues.

### A.    Statutory Ground

The mother disputes the State's proof for paragraphs (h) and (*l*) under section 232.116(1).  When the juvenile court relies on more than one paragraph, we may affirm "on any ground supported by the record."  *In re A.B.*, 815 N.W.2d 764, 774 (Iowa 2012).  We focus on paragraph (h).  It requires clear and convincing proof that (1) the child was three years old or younger; (2) he had been adjudicated as a CINA under section 232.96; (3) he had been removed from the parent's physical custody for at least six months of the last twelve months, or for the last six straight months and any trial period at home was less than thirty days; and (4) he could not be returned to her custody "as provided in section 232.102 at the present time."  Iowa Code § 232.116(1)(h); *In re L.M.*, 904 N.W.2d 835, 839 (Iowa 2017) (reading "present time" as the date of the termination hearing).

---

932 N.W.2d 588, 589 n.1 (Iowa Ct. App. 2019).  The juvenile court's factual findings do not bind us, but we give them weight, especially when deciding whether a witness is to be believed.  *Id.*

The mother concedes that the State's evidence met the first three elements. But on the fourth element, she asserts the department failed to move forward from monitored visits, and the service provider never expressed safety concerns.

Both the State and P.C.'s guardian ad litem (GAL) filed responses. The GAL argues that the mother was not prepared to assume the role of a parent at the time of the trial. The State also questions the mother's readiness, noting that she left in-patient treatment twice without completing those programs. True, the mother left the YWCA program on her doctor's recommendation. But she was not forthcoming about her new roommate, another individual from treatment, providing no information for the department to do a background check. We agree with the State and GAL. The mother testified that she was not prepared to resume care of P.C. at the time of the hearing. No doubt, the mother had taken a positive step toward recovery. But her long history of methamphetamine use still loomed too large to entrust P.C. to her custody.

## B.    Best Interests

The mother next argues that terminating her parental rights was not in P.C.'s best interests.[4] In addressing that argument, we emphasize the child's safety; the best placement for furthering his long-term nurturing and growth; and his physical, mental, and emotional condition and needs. *See In re A.B.*, 957 N.W.2d 280, 300 (Iowa 2021) (discussing Iowa Code section 232.116(2)). We also consider P.C.'s integration into his foster family. *See* Iowa Code § 232.116(2)(b).

---

[4] Although the mother cites both subsections (2) and (3) of Iowa Code section 232.116, she only uses the best-interests terminology. We thus limit our analysis to subsection (2).

The mother points to her strong connection with P.C., highlighting the visitation time she spent cuddling and interacting with him. Indeed, the juvenile court acknowledged P.C.'s strong bond with his mother. But the court also recognized his comfort level with his foster parents. The court noted that the foster home was "stable" and "the only home that [P.C.] has ever known."

According to her testimony, the mother is just beginning to appreciate her own self-worth. Because she is in those early days of recovery, she is not yet able to nurture and support the needs of her young son. His best interests are served by moving toward a stable and permanent placement with his foster family. *See In re J.H.,* 952 N.W.2d 157, 173 (Iowa 2020) (declining to deprive child of permanency "hoping someday" that parent will be able to provide stable home).

### C.    Reasonable Efforts

The department must make reasonable efforts to avoid removal of children from their parents and to reunite them with their parents after removal. *See* Iowa Code §§ 232.102(4)(b), 232.102A(1)(a). The mother contends that the department failed in its reasonable-efforts obligation by ignoring her requests for more visitation with P.C.[5] On April 19, 2024, the mother moved for reasonable efforts, asking for more visitation as she transitioned to her own apartment in Humboldt from the YWCA inpatient program in Fort Dodge. Before the court had a chance to rule on that motion, the mother left the in-patient program based on

---

[5] At the termination hearing, the juvenile court chronicled its sequence of reasonable-efforts findings—September 30, October 20, November 7, and December 8 of 2023, and January 17, February 28, March 23, and April 10 of 2024. The mother's attorney agreed that her reasonable-efforts challenge was limited to the time between April 10 and May 1 of 2024.

her doctor's recommendation. The juvenile court then considered "the motion for lack of reasonable efforts simultaneously with the request for termination and the final permanency."

In its termination ruling, the court concluded that the department "provided family interaction between [the mother] and [P.C.] as frequently as distance, and the mother's substance use treatment schedule, would allow." We reach the same conclusion: the department made reasonable efforts to reunify P.C. with his mother. The visitation offered was appropriate to the circumstances. *See In re C.B.*, 611 N.W.2d 489, 493 (Iowa 2000) (noting reasonable efforts include visitation "designed to facilitate reunification while providing adequate protection for the child").

### D. Six-Month Delay in Permanency

The mother contends that she should have been allowed six more months to work toward reunification with P.C. To make such an allowance, the juvenile court must find that the need for removal will be erased at the end of that six-month extension. Iowa Code § 232.104(2)(b). The record did not support that delay in permanency. The mother cannot show that P.C. would be safe in her custody after six months, or that further delay was in his best interests. *See In re W.T.*, 967 N.W.2d 315, 323 (Iowa 2021).

**AFFIRMED.**