# IN THE COURT OF APPEALS OF IOWA

No. 25-0791
Filed July 23, 2025

IN THE INTEREST OF R.M.,
Minor Child,

A.M., Mother,
        Appellant.
_____

Appeal from the Iowa District Court for Scott County, Christine Dalton,
Judge.

A mother appeals the termination of her parental rights to her child.
**AFFIRMED.**

Patricia Rolfstad, Davenport, for appellant mother.

Brenna Bird, Attorney General, and Tamara Knight, Assistant Attorney
General, for appellee State.

Jennifer Olsen, Davenport, attorney and guardian ad litem for minor child.

Considered without oral argument by  Greer, P.J., and Badding and
Chicchelly, JJ.

**CHICCHELLY, Judge.**

A mother appeals the termination of her parental rights to her child, R.M., born in 2023.[1]  Upon our de novo review, we affirm the termination.

## I.      *Background Facts and Proceedings.*

The mother has had a tumultuous history with the Iowa Department of Health and Human Services ("the department").  This family first came to the attention of the department after the mother drove "erratically" while "intoxicated and agitated" with her son in the backseat.  Around a month later, the mother attempted suicide.  The mother's two oldest children were then removed and placed with their father.

Throughout the proceedings regarding her older children, the mother's progress was inconsistent at best.  She oscillated between getting regular mental health-treatment and demonstrating positive parenting skills, then reverting back to her old ways.  Despite the mother's lack of improvement, the juvenile court gave her another chance and declined to terminate the mother's parental rights to her two older children.  But as the juvenile court later conceded, "[t]hat [decision] proved to be a mistake."  Instead of making progress,

> [t]he mother's conduct did not improve.  She threatened to kidnap the children several times.  She also threatened to kill the father.  Her false reports about the father to the Department and law enforcement increased in both frequency and severity, leading to criminal charges for harassment and false emergency reports.
> And she tried to hire a hitman to kill the father.  About two months after the dispositional order, she contacted a person over Snapchat to ask if he knew any "shady people" because she needed to make the father "disappear."  When the person asked "how sketchy," the mother replied, "ideally murder."  The person relayed

---

[1] The parental rights to any putative fathers were also terminated.  Because no putative father contested termination or appealed, we do not address them.

the messages to an undercover federal agent, who contacted the mother and posed as a hitman. The mother stated, "I need someone out of the picture so in prison or no longer on the planet." The agent offered to do it for $2000 and the mother said "deal." Two days later, the mother contacted the agent asking how soon he could kill the father, stating it was "kinda urgent." She then provided the father's home address—where the children also lived—and wired him $200. She was charged with the federal offense of using interstate commerce facilities in the commission of murder-for-hire. *See* 18 U.S.C. § 1958. And she was placed in federal custody while the charge was pending.

*In re L.S.*, No. 25-0185, 2025 WL 1090892, at *2 (Iowa Ct. App. Apr. 9, 2025). The mother later pled guilty and was released prior to sentencing.

During that time, the juvenile court terminated the mother's parental rights to the two older children, citing the mother's uncertain future given her pending charges. But even without this factor, the juvenile court found the mother's claims of progress were unreliable:

> [The mother's] credibility is undermined by the numerous times she has lied, manipulated others, staged or accused people of actions they did not take. She even accused someone of sexually abusing her daughter and on a separate occasion applied make-up to her daughter to photograph a fake injury. She manufactured text messages and lied on the stand at several hearings. She made well over [twenty] false calls of abuse to [the department] and law enforcement, potentially disrupting her children's lives, with the goal of undermining their father.

The mother appealed the termination of her parental rights to the two older children, and we affirmed. *Id.* at *3.

While the mother was released on bond, she gave birth to R.M. But when R.M. was just five weeks old, the mother violated her supervised release conditions and returned to custody. The department removed R.M. from the mother and placed her with R.M.'s half-siblings' father, who was the same person that the mother had attempted to kill.

Another juvenile case ensued, with R.M. being adjudicated in need of assistance. The mother's consistency with services was similar to that of the previous proceeding, in that it was nearly nonexistent. While the mother had visits with R.M. when able, incarceration prevented the mother from meaningfully participating in department services. In particular, the mother refused to cooperate with the department to establish paternity. She named six possible fathers, most of whom were excluded through DNA testing or unable to be located, and the court implied that this was a tactic used by the mother to delay proceedings.

Despite any delays, a second termination hearing occurred in May 2025, after which the juvenile court terminated the mother's parental rights to R.M. The mother appeals.

## II.     Review.

We review termination-of-parental-rights proceedings de novo. *In re A.S.*, 906 N.W.2d 467, 472 (Iowa 2018). While not binding on us, we give weight to the juvenile court's findings of fact, "especially in assessing the credibility of witnesses." *Id.* (citation omitted).

## III.     Discussion.

We generally use a three-step analysis when reviewing termination of parental rights, including whether: (1) statutory grounds for termination have been met, (2) termination is in the best interests of the child, and (3) we should exercise a permissive exception to termination. *Id.* at 472–73. But because the mother only addresses the second step, we limit our analysis to the child's best interests.[2]

---

[2] The mother makes additional arguments against the department, including lack of visitation and diligence during the placement process, which we interpret as a

*See In re J.F.*, No. 19-1647, 2020 WL 110404, at *1 (Iowa Ct. App. Jan. 9, 2020) ("But when, as here, the parent's claims only relate to one step in our analysis, we only address that step.").

To determine whether termination is in the best interests of the child, we "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2) (2024). "It is well-settled law that we cannot deprive a child of permanency after the State has proved a ground for termination . . . by hoping someday a parent will learn to be a parent and be able to provide a stable home for the child." *In re A.B.*, 815 N.W.2d 764, 777 (Iowa 2012) (citation omitted). The mother claims that preserving "the familial bond is always preferable" to severing that relationship, but we disagree. While R.M.'s bond with her mother is one factor in determining best interests, *see In re L.A.*, 20 N.W.3d 529, 535 (Iowa Ct. App. 2025) (finding "the parent-child bond is a relevant consideration in the best-interests analysis"), we must also look at the "parent's past performance" as that "may be indicative of the

---

reasonable-efforts challenge. *See In re L.T.*, 924 N.W.2d 521, 527 (Iowa 2019) (requiring the State to "show reasonable efforts as a part of its ultimate proof the child cannot safely be returned to the care of a parent" (citation omitted)). But the mother did not raise this issue before appeal, so we find it waived. *See In re E.H.*, No. 21-0467, 2021 WL 2709486, at *2 (Iowa Ct. App. Jun. 30, 2021) (collecting cases in which a parent waived their reasonable-efforts challenge). The mother makes further reasonable-efforts arguments that the putative fathers were not given proper notice by the department, which we similarly find waived. But we also note that the mother is not entitled to make such arguments, either on behalf of another party or to advance her own position. *See In re S.O.*, 967 N.W.2d 198, 206 (Iowa Ct. App. 2021) (preventing a parent from "assert[ing] facts or legal positions pertaining to the other parent" or "argu[ing] preservation of their rights based on the situation of the other parent"). We therefore do not address these arguments further.

quality of the future care that parent is capable of providing," *A.B.*, 815 N.W.2d at 778.

Here, the mother's past performance does not convince us that she is able to safely and properly care for R.M. Based on the record before us, we find that the mother has a history of putting her children in harm's way, noncompliance with services, substance use, dishonesty, manipulation, and even homicidal intent. She threatened (and attempted to carry out) an extreme act of violence against her children's father despite the risks it posed. And as the juvenile court noted, had the mother actually killed him as intended, "her children would have suffered the loss of their father, possibly witnessed his death, or even possibly been physically harmed themselves." These actions led to criminal charges, which, as of the termination hearing, were not fully resolved and could lead to more uncertainty for R.M. And during this time while the mother was incarcerated, R.M. has thrived out of her care. *See In re M.W.*, 876 N.W.2d 212, 224 (Iowa 2016) (considering the child's favorable integration into their foster placement to support termination). We decline to deprive R.M. of permanency in the hopes that the mother will improve when the mother's actions have shown she will not change. Accordingly, we find that R.M.'s best interests support terminating the mother's parental rights and therefore we affirm.

## IV.    *Disposition.*

Because termination of the mother's parental rights is in the best interests of the child, we affirm.

**AFFIRMED.**